**T. T. BURNETT and Winifred Burnett,**
**Plaintiffs,**

**v.**

**TRANS WORLD AIRLINES, INC.,**
**a corporation, Defendant.**

**Civ. No. 9735.**

United States District Court,
D. New Mexico,
Albuquerque Division.

Dec. 13, 1973.

September 6, 1970, hijacking of a Trans World Airlines jet to Amman, Jordan. The following facts and conclusions are uncontroverted, having been agreed to by stipulation of the parties, and represent the legal and factual premises upon which these motions are considered by the court.

Plaintiffs T. T. Burnett and Winifred Burnett, residents of Albuquerque, New Mexico, entered into contracts of carriage with the defendant in the summer of 1970 for a journey through Asia and certain Mediterranean countries. Having completed the course of their travels, plaintiffs boarded TWA flight 741 in Athens on September 6, 1970, en route to New York City. Unfortunately, however, the Burnetts soon learned that an additional country, unmentioned in their brochures, would be added to their itinerary. Shortly after boarding additional passengers in Frankfurt, the aircraft deviated from its scheduled course and it was announced that the plane was being hijacked by members of the Popular Front for the Liberation of Palestine. The diverted aircraft headed for Jordan, and a landing was effected on a dry lake bed in the desert outskirts of Amman.

During their period of desert captivity, the plaintiffs experienced severe emotional trauma from the actions of the hijackers, fearing that their lives might be in jeopardy. They remained imprisoned aboard the aircraft for six days in cramped quarters, being deprived of regular food and drink, and bodily suffered from the great temperature extremes of the desert. In addition, T. T. Burnett suffered from the swelling of his feet and the filling of his ankles with fluid. Both plaintiffs also suffered various other physical ailments from their confinement.

Both parties agree that the Warsaw Convention and the Montreal Agreement are applicable and that the carrier is liable if an "accident" taking place on board the aircraft or in the course of any of the operations of embarking or disembarking caused damages sustained

Richard E. Ransom, Smith & Ransom, Albuquerque, N. M., for plaintiffs.

Jackson G. Akin, Rodey, Dickason, Sloan; Akin & Robb, Albuquerque, N. M., Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant.

## MEMORANDUM OPINION

BRATTON, District Judge.

Jurisdiction in this removed personal injury action is founded on diversity of citizenship. The parties have submitted to the court for disposition cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Plaintiff moves for partial summary judgment on the issue of liability while defendant moves for summary judgment by dismissal of the action.

Plaintiffs seek recovery under Article 17 of the Warsaw Convention, 49 Stat. 3018, for bodily injuries and mental anguish allegedly suffered as a result of a

in the event of a "wounding or any other bodily injury" to either plaintiff. It is agreed that an accident did take place and that the liability of the carrier is absolute and is limited to $75,000.

The Warsaw Convention, concluded in October, 1929, marked an official cognizance by the signatory nations of the dawning of the commercial air age. The delegates, realizing the potential legal hazards posed by the expansion of international air travel, attended the Conference with a twofold purpose in mind. Cognizant of the fact that international air transport would link nations of vastly diverse cultural and legal systems, it was hoped that a certain degree of legal uniformity could be achieved by reference to a controlling body of law to govern common problems. Secondly, the delegates desired to limit the potential liability of the airlines from the result of air accidents.

The United States was not an original party to the Warsaw proceedings and only later, on October 29, 1934, did President Roosevelt proclaim the nation's adherence to the Convention after the favorable recommendation of the Senate. The official notice of adherence had been deposited in the archives of the Ministry for Foreign Affairs of Poland on July 31, 1934. The subsequent history of the American participation in Warsaw reveals a continuing and growing disaffection within the United States concerning certain provisions of the Convention. Most vehemently disliked were the articles providing that liability of the carrier was based upon proof of negligence and that the damage limitation was a mere $8,300. Finally, dissatisfaction swelled to the point that our government formally deposited its notice of denunciation of the Convention in Warsaw on November 15, 1965, becoming effective six months thereafter.

However, despite these ominous manifestations of disaffection, continuing United States involvement in a uniform scheme of international air law was saved by the work product of the Montreal Conference, convened in February, 1966. Although these proceedings themselves did not result in an accord among the attending states, the proposals there submitted by the United States became the essence of the so-called Montreal Agreement,[1] effective as of May 16, 1966. This agreement introduced two major modifications in the Warsaw scheme of liability in that: (1) the carrier's limitation of liability for the death, wounding, or other bodily injury

---

1. "On May 14, 1966, the United States formally withdrew its notice of denunciation and announced the approval by the Civil Aeronautics Board of an interim arrangement submitted by the International Air Transport Association (IATA). Dep't of State Press Release Nos. 110, 111, 54 Dep't State Bull. 955 (1966). This interim arrangement, known as Agreement CAB 18900, provides, inter alia, that the parties thereto (including the defendant and the majority of domestic and international air carriers) agree to include in their tariffs to be filed with the CAB a 'special contract' by which the carrier would waive its defenses provided by Article 20(1) of the Convention and also its limitation of liability under the Convention up to $75,000. The CAB Order Approving Agreement is to be found in 31 Fed.Reg. 7302 (1966).

"Together, the Agreement (signed by each airline), the requisite tariff, filed pursuant to the Agreement on May 16, 1966, the Notice to Passengers included within the ticket informing the passenger of the change in the regime of the Warsaw Convention (and of its applicability), and the CAB order, constitute what has been called the 'Montreal Agreement,' since these documents were initially presented at a conference in Montreal prompted by the United States denunciation of the Convention. L. Kreindler, 1 Aviation Accident Law, chs. 11, 12 (1971 ed.). It should be emphasized that '[t]he Montreal system has not changed the text of either the Warsaw Convention or the Hague Protocol,' but rather '. . . impose[s] upon international aviation involving the United States a quasi-legal and largely experimental system of liability that is essentially contractual in nature.' Id., at 12A–2."

The preceding footnote has been excerpted from footnote 1 of Husserl v. Swiss Air Transport Company, Ltd., 351 F.Supp. 702, (S.D.N.Y.1972).

of a passenger was elevated to $75,000 and; (2) the carrier could no longer avail itself of the due care defense with respect to such claims, i. e., a system of absolute liability was imposed. For an extensive discussion of the Warsaw-Montreal proceedings see Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967).

With this background in perspective, the issues of the case at hand may be discussed. The principal issues for consideration by the court are: (1) whether mental anguish alone, without accompanying bodily injuries, is compensable under Article 17 of the Warsaw Convention and; (2) whether mental anguish resulting from a bodily injury is compensable under Article 17. Article 17 provides:

> "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other *bodily injury* suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." (Emphasis added.)

■ The key phrase for interpretation is "bodily injury." Plaintiff has argued that since this is a removed action, state law controls in matters of substance, therefore compelling the court to look to the tort law of New Mexico to discover the scope of the phrase in controversy. To the contrary, however, the meaning of the Warsaw Convention is a matter of federal law. It is a sovereign treaty and as such is the supreme law of the land, preempting local law in the areas where it applies. United States Constitution, Art. VI, cl. 2; United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798 (2d Cir. 1971).

In Noel v. Linea Aeropostal Venezolana, 247 F.2d 677, 679 (2d Cir. 1957), the court observed, in discussing the proper interpretation of the Warsaw Convention:

> "Although jurisdiction of the first count under the Warsaw Convention is allegedly based on diversity, the law to be applied in this case is not state law but a federal treaty. It is applied in the state courts not because it expresses a state policy which a federal court must follow, but because it expresses federal policy which a state court must follow."

■ In interpreting the meaning of the terms employed in the Convention, the French legal meaning must govern. Block v. Compagnie Nationale Air France, 386 F.2d 323, 330 (5th Cir. 1967), cert. den. 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); Husserl v. Swiss Air Transport Company, Ltd., 351 F.Supp. 702, 708 (S.D.N.Y.1972). French was the sole official language of the Convention, Article 36 stating that, "This convention is drawn up in French in a single copy * * *" The United States deposited its notice of adherence to the official French version on file in the archives of the Ministry for Foreign Affairs of Poland. Furthermore, the Statutes at Large contain not only the English translation but the official French text as well. 49 Stat. 3000 et seq. It follows also that by looking to one language for guidance in interpretation, the policy of uniformity which the delegates sought to implement may thereby be achieved.

■ Although the ultimate question presented is the construction of a treaty of the United States and therefore a question of domestic law, the court must at the outset ascertain the meaning of the Warsaw Convention drawn in French in order to determine what that domestic law is. Thus, the court is essentially confronted with the determination of a question of foreign law. However, this finding no longer affects the method of inquiry into its substance. Historically, the determination of foreign law in the federal system had been considered a question of fact. However,

Rule 44.1,[2] Fed.R.Civ.P., enacted in 1966, sounded the death knell to this approach by mandating that all such questions in the future should be treated as questions of law. See Wright and Miller, Federal Practice and Procedure § 2441 et seq. (1971) and Bamberger v. Clark, 129 U.S.App.D.C. 70, 390 F.2d 485, 488 (1968). Such a determination therefore does not obstruct the court's disposition of a motion for summary judgment. See Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Prods., Inc., 323 F.Supp. 630, 635 (S.D.N.Y.1971); First Nat'l. Bank of Arizona v. British Petroleum Co., 324 F.Supp. 1348, 1354–1355 (S.D.N.Y. 1971). See also Caribbean Steamship Co. v. La Societe Navale Caennaise, 140 F.Supp. 16, 20–21 (E.D.Va.1956).

■ Since the substantive issue is ripe for decision, the analysis may proceed to a determination of whether mental anguish alone is encompassed within the French legal meaning of bodily injury under the Warsaw Convention. The French text of Article 17, 49 Stat. 3005, reads as follows:

> "Le transporteur est responsable du dommage survenu en cas de *mort, de blessure ou de toute autre lésion corporelle* subie par un voyageur lorsque l'accident qui a causè le dommage s'est produit à bord de l'aéronef ou au courts de toutes opérations d 'embarquement et de débarquement." (Emphasis added.)

The controlling phrase for the purpose of interpretation would seem to be "ou de toute autre lésion corporelle" (or any other bodily injury) for both the terms mort (death) and blessure (wound) are by necessity incorporated within it. As is done in American law, French law distinguishes sharply between bodily injury (lésion corporelle) and mental injury (lésion mentàle). Lésion corporelle has been defined in a leading work to mean "an infringement of physical integrity (l'atteinte à l'integrité physique)."[3] The definition gives not the slightest indication that mental injuries are to be included within its domain. An examination of the meaning of the words lésion and mentàle (as defined in Cassell's *New French-English, English-French Dictionary*, 1962) reveals the meaning of the phrase "lésion mentàle" to be mental wrong or injury. The two phrases appear to be mutually exclusive and therefore, sound construction compels the court to attribute to "lésion corporelle" its normal import only, excluding mental injury.

Plaintiffs' contention that "blessure" encompasses mental anguish must similarly be denied. The critical words of Article 17, "mort, de blessure, and ou de toute autre lésion corporelle" must be examined together in order to ascertain their contextual meaning. Although the *French-English Dictionary of Legal Terms* by Jules Jeraute defines "blessure" to include not only a wound but also hurt or injury, when the term is modified by the subsequent phrase of the provision, it seems apparent that the drafters utilized the word in solely a physical sense. The court in *Husserl, supra,* 351 F.Supp. p. 708, proceeding on a similar analysis, reached an identical conclusion in observing that mental anguish alone does not fall within the purview of Article 17.

The legislative history of a treaty comprises a highly relevant source as an aid to interpretation of its provisions.

2. A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. The court's determination shall be treated as a ruling on a question of law.

3. Henry P. de Vries translation:
   A. Colin and H. Capitant, *Traité de Droit Civil* 605 (revised by J. de la Morandiére, 1959) Henry Capitant, Professor of Law, University of Paris, Juillot de la Morandiére, Dean Emeritus of the Faculty of Law, University of Paris.

The First International Conference on Private Air Law (the predecessor of the Warsaw Convention) authored an initial draft of the liability provision which read:

"Le transporteur est responsable des accidents, pertes, avaries et retards.

"The carrier is liable for accidents, losses, damage to goods and delays."[4]

The carrier had been provided the due care defense but no language of limitation concerning recoverable damages had been included. If an accident had occurred through the carrier's negligence, the broad phraseology above would have permitted recovery for both physical and mental injuries. In this era, internal French law predicated the carrier's liability on contract, allowing a passenger to recover for mental as well as physical injuries. Analyzing French court decisions prior to 1925, Professor Mazeaud concluded that recovery could be obtained against a carrier:

". . . even in the cases where the carrier in failing to perform its contractual obligations infringed the emotional condition of the passenger: his sentiments of affection in delaying his arrival at funeral ceremonies, the comfort to which he is entitled by placing him in a baggage car, and even for the simple inconvenience of delay in arrival."[5]

To facilitate further study of the problem in order to produce a provision more readily acceptable to those nations whose law was not so liberal, the Conference appointed a group of air law experts who would report to the Second International Conference in Warsaw in 1929. The text they submitted became the model for present Article 17 and it provided in pertinent part:

"Le transporteur est responsable du dommage survenu pendant le transport:

(a) en cas de mort, de blessure ou de toute autre lésion corporelle subie par ur voyageur."[6]

By thus restricting recovery to bodily injuries, the inference is strong that the Convention intended to narrow the otherwise broad scope of liability under the former draft and preclude recovery for mental anguish alone. Had the delegates desired otherwise, there would have been no reason to so substantially modify the proposed draft of the First Conference.

Concurring in this conclusion, Professor Juglart of the Law Faculty of the University of Paris has proferred the opinion that Article 17, as now constituted, does not permit recovery for mental injuries. He concludes that to so recover, the Article would have to undergo amendment to read "lésion corporelle ou mentàle." [7]

Further support for the conclusion that mental anguish alone does not fall within the reach of "lésion corporelle" may be found by analogy to the Berne Convention on International Rail Transport. Its original draft in 1954 closely parallelled the language of Article 17 and permitted recovery for bodily injury only. However, the Convention was later modified by the addition of the words "ou mentàle" to the text and only then, according to one author, did it allow recovery for mental injuries.[8] The governing French text now reads:

"Entendue de la Responsabilité

1. Le chemin de fer est responsable des dommages resultant de la mort, des blessures ou de toute autre

4. (de Vries translation: Article 5 of Convention Draft, *Conference Internationale de Droit Privé Aérien*, 1926, *Ministère des Affaires Etrangères* 41–42, Series C. (79).

5. Henri Mazeaud, Leon Mazeaud, and Andre Tunc, *Traité Théorique et Pratique de la Responsabilité Civile Délictuelle et Contractuelle*, 416–417 (5th ed. 1957).

6. (de Vries translation: *Compte Rendu de la Ie Session*, May 1926, *Comité International Technique d'Experts Juridiques Aériens 64).*

7. [de Vries translation: Juglart, *Traité Elémentaire de Droit Aérien*, 330 (1952)].

8. [de Vries translation: M. Florio, *La Responsabilite du Chemin de Fer pour la Mort et les Blessures de Voyageurs en Traffic International*, 51, (1969)].

atteinte à l' integrité physique ou mentale d'un voyageur causées par un accident en relation avec l' exploitation ferroviaire survenu pendant que le voyageur sé journe dans les vehicles, qu' il y entre ou qu' il en sort."

The de Vries translation states:

"Extent of Liability

1. The railroad is liable for damages resulting from the death, wounds or any other infringement of the physical or mental integrity of a passenger caused by an accident related to the operation of the railroad sustained while the passenger remains within the cars, while entering or leaving." [9]

The Florio study (footnoted previously) defines les blessures as follows, pp. 58–59:

"B. *Les Blessures*

125. Within the meaning of the [Berne] Convention, blessure is any temporary infringement of bodily integrity such as flesh wounds, fractures, internal injuries."

The same study defines "atteinte à l' integrité physique" as follows:

"126. The infringement of the physical integrity is a permanent bodily injury (lésion corporelle durable)."

Therefore, the study equates "atteinte à l'integrité physique with "lesion corporelle durable," both phrases excluding severe mental injuries. Since "lésion corporelle durable" does not encompass permanent mental injuries, it follows that "lésion corporelle" cannot include mere mental anguish.

■ Plaintiffs advance further the argument that the hijacking itself and the subsequent diversion of the aircraft constituted a bodily injury in the sense that this abduction deprived them of their right to be free of interference with their persons. However, the construction requested sweeps beyond the recognized scope of the phrase and the court finds it to be without merit.

■ Plaintiffs next contend that recovery may be obtained for mental anguish suffered as a result of physical injuries according to generally recognized principles of jurisprudence. Supporting this contention is the language of Article 17 itself which states that the carrier is liable "for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger . . ." Certainly, mental anguish directly resulting from a bodily injury is damage sustained in the event of a bodily injury. The delegates apparently chose to follow this well recognized principle of law allowing recovery for mental anguish resulting from the occurrence of a bodily injury, the emotional distress being directly precipitated by the bodily injury being considered as a part of the bodily injury itself. Therefore, plaintiffs may recover in this action for any such emotional anxiety that they can demonstrate resulted from a bodily injury suffered as a consequence of the hijacking.

■ Finally, defendant urges the court to adopt a contact rule in the interpretation of bodily injury, i. e., that any bodily injury sustained must be the result of physical contact between the body and another object. However, the defendant has failed to adduce any evidence in support of this construction. Brief reflection allows one to pose many instances in which a bodily injury may result without any physical contact whatsoever. Such a sterile interpretation would surely do violence to the intent of the Warsaw framers.

Having determined that damages for mental anguish alone cannot be recovered under Article 17 of the Warsaw Convention, that part of plaintiffs' complaint which is so premised will be dismissed. However, the court having decided that no contact rule applies, and the parties having agreed in their stipulation of facts that as a result of an accident, various "bodily injuries" were suffered by the plaintiffs, it is by the

9. [de Vries translation: *Journal Officiel de la Republique Francaise* 7173, (July 4, 1973)].

Court ordered that plaintiffs' Motion for partial summary judgment as to the issue of liability is hereby granted and that the defendant's Motion for summary judgment is denied.