**Cyrus H. WARSHAW et al.**

v.

**TRANS WORLD AIRLINES, INC.**

**Civ. A. No. 74–2947.**

United States District Court, E. D. Pennsylvania.

Dec. 14, 1977.

As Amended Dec. 21, 1977.

---

John C. Butera, King of Prussia, Pa., for plaintiffs.

David L. Steck, Rawle & Henderson, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

### I. STATEMENT OF PROCEDURAL HISTORY AND FACTS OF THE CASE

On October 13, 1973, Cyrus H. Warshaw boarded Trans World Airlines (TWA) Flight 756 in Philadelphia which was bound for London. At the time he had an upper respiratory tract infection, but was otherwise in good health. The level of hearing in his left ear, on which a stapes replacement operation had been performed approximately thirteen years earlier, was essentially normal. Plaintiff claims he experienced a blockage in his left ear, which he was unable to clear during the aircraft's descent as it approached its destination at Heathrow Airport, near London. When he arrived at the terminal, he had completely lost hearing in that ear. Subsequent medical treatment, including surgery, did not cure the condition, one that has been diagnosed as permanent damage to the nerve of the left inner ear. Plaintiff and his wife accordingly instituted suit against TWA for damages as a result of this loss of hearing under the provisions of the Warsaw Convention, 49 Stat. 3000, as modified by the Montreal Agreement, 31 Fed.Reg. 7302 (1966). We tried the case without a jury on the sole issue of liability. We reserved decision with respect to that aspect of the case, pending receipt of further briefs from counsel for the parties who were directed to focus upon the single issue of whether or not this occurrence was an "*accident*" under the terms of the Warsaw Convention as modified by the Montreal Agreement. We hold that the occurrence was not an accident covered by the Convention. It appears that the question before us is one of first impression, which, to our knowledge, has not been decided squarely by any court on the facts before us. Our findings of fact, discussion, and conclusions of law follow:

### II. FINDINGS OF FACT

1. Plaintiffs are Cyrus H. Warshaw and his wife, Sheila. Both are citizens and residents of the Commonwealth of Pennsylvania. (N.T. 24).

2. Defendant is Trans World Airlines, Inc. (TWA), a foreign corporation regularly doing business in Pennsylvania, with its principal place of business in Kansas City, Missouri. (Complaint, ¶ 2; Answer, ¶ 1).

3. Plaintiff Cyrus Warshaw travelled on TWA Flight 756 from Philadelphia International Airport to Heathrow Airport (metropolitan London area); he departed from Philadelphia on the evening of October 13, 1973, and arrived at Heathrow on the morning of October 14, 1973 (local time). Carriage had been contracted for in Pennsylvania, and Mr. Warshaw had been issued and had received the proper form of ticket for

such an international flight. (N.T. 26; Complaint, ¶¶ 4–5; Answer, ¶ 1).

4. Mr. Warshaw was suffering from the effects of an upper respiratory tract infection.[1] One of the symptoms of the plaintiff's illness was an aggravation during this flight of the mucus lining of the eustachian tubes; these small passageways run from the throat to the middle ear, and ordinarily, either by swallowing or yawning, one is able to equalize the pressure between the middle and outer ear. Because of his illness, Mr. Warshaw's eustachian tubes were blocked both by mucus and by the swollen linings of the tubes; thus, the tubes did not permit the passage of air necessary to equalize the pressure. (N.T. 32, 43–44, 55–57).

5. A normal human ear can be described as a mechanism which contains three interrelated systems: (a) the outer ear; (b) the middle ear; and (c) the inner ear.

(i) The outer ear includes the auricle (the flaps of skin which we commonly think of as the "ear"), and the ear canal, a passage running into the skull. The ear canal terminates at the ear drum, a piece of skin which vibrates as sound waves, (i. e., pressure variations in the atmosphere) strike it. These vibrations can best be characterized as *"in-and-out"*, the ear drum alternately pushing in ,and bulging out very slightly. (N.T. 47–57).

(ii) The middle ear consists of a chamber in the skull, separated from the outer ear by the ear drum and from the inner ear by two openings called the "oval window" and the "round window". A complex of three tiny bones, the malleus, the incus and the stapes (hammer, anvil, and stirrup), bridge the space between the ear drum and the oval window. Vibrations of the ear drum are multiplied some thirty times in force by the geometry of these tiny bones. The stapes "footplate", a small shaving of bone, sits in the oval window and vibrates in response to the vibrations passed through the three bones from the ear drum to the footplate. The round window is sealed by an elastic membrane that closes off the end of the inner ear (cochlea), which is not sealed by the oval window. The middle ear is connected to the pharynx (throat), by the eustachian tube, which permits the pressure inside the ear drum to be equalized to correspond to gross changes in pressure on the outer side of the drum.[2] Ordinarily, swallowing is done four times a minute, at which intervals the eustachian tube permits air to enter into or exit from the middle ear, thus equalizing the pressure. Were this not to occur, the ear drum would be pushed either to one side or the other of its normal, centered position, causing pain, possible injury, and perhaps a change in the hearing level. (N.T. 47–57).

(iii) The inner ear contains the cochlea, a fluid-filled labyrinth shaped somewhat like a snail shell, and the endings for the auditory nerves. Movement of the stapes footplate in the oval window sets up pressure waves in the fluid of the inner ear. The pressure waves excite the nerve endings, and stimulate electrical currents which the brain recognizes as "sound". (N.T. 49).

6. One cause of deafness is a condition known as *otosclerosis*; that condition is one in which there is calcification of the bones of the middle ear. Calcification is the deposit of additional bone; its effect is to cement the middle ear bones and to anchor the stapes footplate in the oval window, thereby impeding passage of the sound vibrations and causing air conduction deafness.[3] Plaintiff suffers from *otosclerosis*,

1. The evidence established that Mr. Warshaw either had a cold, a bacterial infection, a virus, or a combination of these ailments. The specific nature of the malady is not significant; the only fact that is relevant is the presence of these symptoms; any one of them could produce sinus and eustachian tube blockage.

2. "Gross changes" refer to shifts in pressure which occur, for example, with weather changes, and particularly with variations in altitude or depth. High frequency pressure changes of small magnitude are generally considered to be "sound", and would result in normal vibration of the various parts of the ear which have already been described.

3. Air conduction deafness, first means the inability to hear sounds transmitted through the air to the ear drum, and then through the small

and by 1961 had lost so much of his hearing that surgery had to be considered to stave off deafness. (N.T. 48–50).

7. A *stapedectomy* is surgery performed on persons who suffer air conduction hearing loss due to *otosclerosis*, but have not suffered severe bone conduction loss of hearing. The procedure is as follows: the middle ear is penetrated through an opening which has been made in the ear drum. The calcified stapes footplate and oval window are fractured, the pieces are removed, and a replacement is fashioned out of plastic, steel, fat, tissue, or other materials. Such an operation was performed on Mr. Warshaw's left ear in March, 1961; a piece of plastic tubing was used to replace the stapes, and a vein graft performed to close the oval window. The plastic tubing was fitted into the center of the vein graft; it transmits vibrations to the fluid in the inner ear. The vein graft, a flap of tissue taken from another vein in the body, closes off the opening to the inner ear and to the fluid chamber, while permitting vibrations to pass. The operation has a high probability of success when performed on patients who are amenable to such treatment; it was extremely successful in Mr. Warshaw's case. Indeed, he and his doctor decided that it was unnecessary to proceed with a similar operation on the right ear. (N.T. 29, 51–52, 58).

8. At the time of the flight in 1973, Mr. Warshaw's hearing in his left ear was normal, as demonstrated by auditory tests, personal experience, and observation by two business associates who were on the same flight and who had the opportunity to observe Mr. Warshaw both during the prior twelve month period, as well as the fifteen to thirty minute interval immediately prior to embarkation. (N.T. 6–10, 15–23, 29).

9. An individual who has undergone a stapedectomy is no more sensitive to air pressure changes than ordinary persons, if the eustachian tube is open and functioning. However, such a person may be more sensitive than others to such pressures if the tube is in fact blocked. (N.T. 100–04).

10. The aircraft was a Boeing 707–331C, serial number 20428, an aircraft used commonly for trans-oceanic flights. That aircraft had been issued a "Standard Airworthiness Certificate" on July 24, 1970. (Exhibit D–1). The parties have stipulated that it was operating in normal fashion at the time of the flight, and suffered no malfunctions during the entire flight.

11. The routine flight altitude for a Boeing 707 on a transatlantic flight is between 30,000 and 40,000 feet. (N.T. 61, 65, 86).

12. Because the air at such altitudes is too thin to support human life comfortably, if at all, such airplanes are provided with a cabin pressurization system. The system can operate either manually or automatically, depending in part upon how changes in cabin pressure are controlled, and in part upon the rate of change which is possible. The system on Flight 756 was operated automatically. Thus, there was a maximum pressure differential of eight and six-tenths pounds per square inch between sea level pressure and altitude. Moreover, the change in cabin pressure can be varied at a rate equivalent to the variation in the external atmospheric pressure surrounding the plane for rates of descent or ascent ranging from fifty to two-thousand feet per minute. Valves built into the automatic system close off the cabin vents when the pressure differential from sea level reaches the preset limit; i. e., eight and six-tenths pounds per square inch. Documents produced by defendant and introduced by plaintiff, relative to the operation of the aircraft's systems, establish that in the ordinary course of events the valves close off the cabin above an altitude of 13,000 feet. (Exhibit P–2; Answers to Interrogatories).

bones of the middle ear to the oval window. Sound vibrations may also be conducted through the bone of the skull, but low-volume conversation cannot practically be sensed through such transmission. Hearing aids often are useful for persons who have good bone conductive hearing, because they boost the sound volume sufficiently to cause vibrations of the inner ear fluid through bone transmission of the sound vibrations. Sensineural deafness, damage to the nerve, is not remedial. (N.T. 91–92).

13. On the basis of the information presented by plaintiff, as detailed above, we find that the aircraft in question was flying above 13,000 feet at some point in its flight path, and that the cabin pressure differential from sea level reached eight and six-tenths pounds per square inch at some period of time during the course of the flight. Defendant has stipulated that the cabin pressure systems operated in normal fashion, as designed, and that in the course of the flight, the maximum cabin pressure differential of eight and six-tenths pounds per square inch was achieved.

14. Pressure at sea level is approximately fourteen and seven-tenths pounds per square inch. Therefore, the internal cabin pressure at maximum altitude is approximately six pounds per square inch; when the landing is at a low altitude airport such as Heathrow, the pressure at that point is close to the fourteen and seven-tenths pound level, or more than twice the six pound pressure at maximum altitude. (Exhibit P-2, Answers to Interrogatories; N.T. 75-83).

15. There are no records available with respect to the rate of change of the cabin pressure during repressurization. (Answers to Interrogatories). However, Dr. Myers, the plaintiff's medical expert, testified that his determination of possible relationship to ear damage did not require him to have the rate of change of pressure, because of the following information he had: *FIRST*, data about the gross change in pressure; and *SECOND*, his factual assumption that the plaintiff's eustachian tubes were either completely or substantially blocked. (N.T. 68).

16. At some point during the descent and repressurization of the aircraft, plaintiff experienced blockage of his ears. He attempted to clear his ears by swallowing, but was unable to do so. He was not concerned at the time, because he anticipated that he would be able to clear his ears shortly after landing. However, he was unable to equalize the pressure during the entire period which is critical to this action. (N.T. 30-33).

17. Shortly after their arrival at Heathrow, Plaintiff's companions realized that Mr. Warshaw was unable to hear unless they shouted at him when they were virtually toe-to-toe with him. Mr. Warshaw found that he could not hear in his left ear, and had limited hearing only in his right ear. This represented a sharp change for the left ear, although probably no change at all for the right ear; that ear was also afflicted with otosclerosis, and had not been subjected to any curative operation. (N.T. 9, 20-22, 33).

18. Plaintiff's condition failed to improve despite treatment with antihistamines during the approximate five-day period he was in England and Ireland. (N.T. 34-38).

19. Upon his return to the United States, Plaintiff was examined by Dr. Myers and his associate, Dr. Schlosser, both of whom are ear, nose and throat specialists. (Dr. Myers testified that he was Board-certified in his specialty in 1935). (N.T. 38-39, 41; Exhibit P-1).

20. These examinations showed losses of both air conductive and bone conductive hearing. The air conduction loss was so substantial that the doctors believed the probable cause, given the past stapedectomy, was slippage of the plastic tube prosthesis from the end of the incus bone. However, an operation was necessary to confirm this, and to remedy the situation, if, in fact, that was the problem. (N.T. 43, 55-59).

21. The operation disclosed that the prosthesis was still properly attached to the incus. However, there had been considerable damage at the point at which contact was made with the vein graft that closes the oval window. The region was cleaned, and another prosthesis was fashioned to replace the damaged one, after which the ear was again closed. (N.T. 58-60; Answers to Interrogatories).

22. Recovery from the operation was normal. However, Plaintiff's hearing did not improve nearly as much as it should have, had the slipped prosthesis been the

only problem. Subsequent tests have resulted in a diagnosis of injury to the inner ear and the auditory nerve. (Answers to Interrogatories; N.T. 59, 91–92).

23. Dr. Myers was asked a hypothetical question which included the following facts as premises: (a) the pressure differential from altitude to sea level; (b) the fact that all systems on the plane functioned normally; (c) the inference that would flow from the fact of an individual undergoing a successful stapedectomy on the left ear of the type performed on plaintiff thirteen years earlier; (d) the fact that an individual had an upper respiratory tract infection at the time of the flight; (e) the fact that that individual had good hearing in his left ear prior to a transatlantic flight; (f) the fact that during the descent he felt a blockage in his ears which he was unable to clear; (g) the fact that upon reaching the airport terminal he found that he had lost all hearing in his left ear; (h) the fact that the hearing loss was a continuing one; and (i) the fact that the results of the medical testing, observation and surgery were the same as those which flowed from the actual tests, observation and surgery which Mr. Warshaw underwent.

He was asked if he could form an opinion with respect to the cause of deafness from this information. He stated that, in his opinion, the cause of deafness was a traumatic injury to the inner ear nerves, which was caused by the unequalized pressure change displacing the ear drum, attached bones and prosthesis so that the prosthesis penetrated into the inner ear. (N.T. 89–92).

24. We find, on the basis of the foregoing medical opinion from a duly qualified medical expert, and on the basis of all the evidence adduced for the purpose of justifying the assumptions of the hypothetical question, that the cabin repressurization as Flight 756 descended to London was a cause of the damage to plaintiff's left ear. We also find, on the basis of Dr. Myers' testimony and the relevant evidentiary facts, that the injury was in part caused by the peculiar condition of plaintiff, who had undergone a stapedectomy, and was suffering from a cold at the time. However, that was not the sole cause, because such an injury could have occurred even had he not suffered from a cold; such an impairment could have occurred to an individual with normally functioning middle ear bones.

25. We find credible, and therefore accept, plaintiff's testimony that he did not anticipate nor consider the possibility that he could be subject to such an injury if he took this flight while suffering from a cold. (N.T. 116–117). We also find credible, and also accept, plaintiff's explanation that he thought the blockage of his ears stemmed from the cold, until such time as he was examined by an ear specialist when he returned to the United States. Accordingly, he did not notify the defendant either on the plane, at the terminal at Heathrow, or, indeed, at one of their offices in the United States until more than a week had elapsed after he suffered his loss of hearing. (N.T. 34, 113).

### III. DISCUSSION

#### A. Governing Law

We are presented with a pinpointed issue of interpretation of the Warsaw Convention (Convention), 49 Stat. 3000, as modified by the Montreal Agreement, 31 Fed.Reg. 7302 (1966).[4] Article 17 of the Convention gives rise to the cause of action and establishes the basis for liability, if any; the parties are in accord on this score as per their stipulation. See, Berguido v. Eastern Air Lines, Inc., 369 F.2d 874 (3d Cir. 1966); Husserl v. Swiss Air Transport Company, 351 F.Supp. 702 (S.D.N.Y.1972). The pertinent provision is as follows (translation from French in official United States version at 49 Stat. 3018):

> The carrier shall be liable for damage sustained in the event of the death or

---

4. For a comprehensive analysis of the history of the Convention and the Montreal Agreement, reference is made to the article by Lowenfeld and Mendelsohn, The United States and The Warsaw Convention, 80 Harv.L.Rev. 497 (1966–67). The authors were United States delegates to the Montreal Conference.

wounding of a passenger, if the *accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. (Emphasis added).

As originally drafted, the Convention also included exemptions for due care (Article 20(1)), and for contributory negligence (Article 21), and a limitation of liability to passengers of 125,000 francs, then the equivalent of $8,300.00 (Article 22(1)). Those provisions read as follows (translation from French in official United States version at 49 Stat. 3019):

*Article 20(1)*: The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.

*Article 21*: If the carrier proves that the damage was caused by or contributed to by the negligence of the injured person the court may, in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability.

*Article 22(1)*: In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

Major dissatisfaction with the low limit of liability led to the convocation of a diplomatic conference at the Hague in 1955. The outcome of that conference was an amendment to the Convention which increased the liability limitation to the equivalent of $16,600.00. While twenty six countries did sign this amendment, that Protocol was not ratified by the United States, which still was dissatisfied with the low liability limitation. By November, 1965, the United States had decided that it could

not accept the liability limitation established. The United States exercised its power under Article 39 and denounced the Convention. Article 39 provides as follows (translation from French in official United States version at 49 Stat. 3022):

*Article 39*: (1) Any one of the High Contracting Parties may denounce this convention by a notification addressed to the Government of the Republic of Poland, which shall at once inform the Government of each of the High Contracting Parties.

(2) Denunciation shall take effect six months after the notification of denunciation, and shall operate only as regards the party which shall have proceeded to denunciation.

Coincident with the Notice of Denunciation, the United States let it be known that it was prepared to withdraw that notice if the adherents to the Convention would agree to increase the liability limits of the carriers to a figure approximating $100,-000.00 per passenger. A conference was convened at Montreal in 1966, for the purpose of attempting to resolve the diplomatic crisis which had been precipitated by the Notice. However, no formal agreement was reached, and the conference closed amid the twin clouds which were cast by United States withdrawal from the Warsaw Treaty, and the concomitant disruption of international airline travel which could ensue.

On the eve of the effective date of the denunciation, a proposal was made for an interim agreement that would provide special benefits to United States passengers. This agreement was implemented by the carriers changing their tariffs, as per the provisions of Article 22(1), thus permitting them to bypass treaty amendment procedures which would have required ratification by the parties to it. The pertinent portion of that agreement follows:

The undersigned carriers (hereinafter referred to as "the Carriers") hereby agree as follows:

1. Each of the Carriers shall, effective May 16, 1966, include the following in its

conditions of carriage, including tariffs embodying conditions of carriage filed by it with any government.

"The Carrier shall avail itself of the limitation of liability provided in the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw October 12th, 1929, or provided in the said Convention as amended by the Protocol signed at the Hague September 28th, 1955. However, in accordance with Article 22(1) of said Convention, or said Convention as amended by said Protocol, the Carrier agrees that, as to all international transportation by the Carrier as defined in the said Convention which, or said Convention as amended by said Protocol, according to the Contract of Carriage, included a point in the United States of America as a point of origin, point of destination, or agreed stopping place (1) The limit of liability for each passenger for death, wounding, or other bodily injury shall be the sum of US $75,000 inclusive of legal fees and costs, except that, in case of a claim brought in a State where provision is made for separate award of legal fees and costs, the limit shall be the sum of US $58,000 exclusive of legal fees and costs. (2) The Carrier shall not, with respect to any claim arising out of the death, wounding, or other bodily injury of a passenger, avail itself of any defense under Article 20(1) of said Convention or said Convention as amended by said Protocol.

Nothing herein shall be deemed to affect the rights and liabilities of the Carrier with regard to any claim brought by, on behalf of, or in respect of, any person who has wilfully caused damage which resulted in death, wounding, or other bodily injury of a passenger."

.     .     .     .     .

3.   This Agreement shall be filed with the Civil Aeronautics Board of the United States for approval pursuant to Section 412 of the Federal Aviation Act of 1938 [1958], as amended, and filed with other governments as required. The Agree-

ment shall become effective upon approval by said Board pursuant to said Section 412.

The Agreement was submitted to, and approved by the Civil Aeronautics Board one day prior to the effective date of the Denunciation, which was then withdrawn. *See*, 31 Fed.Reg. 7302 (1966).

The effect of the new agreement was to create a special legal system for injuries on aircraft in international flights. Liability was limited to $75,000, a sum even then far below the recovery limits in other categories of unlimited actions. Liability, however, was no longer based on fault. A special absolute liability standard was created for injuries which were *proximately caused* by some *"accident"* which occurred *on board the plane*, or in the process of embarkation or debarkation. The facts in the case before us clearly call for a conclusion that plaintiff's hearing loss was proximately caused by the change in cabin pressure which occurred as the cabin was repressurized during the descent. *The crucial issue upon which disposition of this matter turns is whether the repressurization was an "accident" within the context of the international treaty, protocol, and controlling contract provisions previously delineated.* We have reviewed the record, the briefs and the contentions of the parties raised at oral argument. Our review leads us to conclude that *routine repressurization of the cabin of a jet aircraft as it descends from a high altitude to land, when accomplished in the normal and usual fashion without any complications or external disruptions, and in accordance with the customarily anticipated preplanned mode, is not an accident under the provisions of Article 17 of the Warsaw Convention, as modified by the Montreal Agreement.*

B.   *Definition of "Accident"*

The Warsaw Convention, 49 Stat. 3000, is a treaty which has been duly ratified by the United States Senate. As such, it is the law of the land, and overrules any state law which may be in conflict with it. *United States v. Belmont,* 301 U.S. 324, 330–31, 57

S.Ct. 758, 81 L.Ed. 1134 (1937); *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The Montreal Agreement, on the other hand, was not a treaty, did not amend the terms of the Warsaw Convention multilaterally, and was not required to be, nor was in fact ratified by the United States Senate. To the contrary, it was a contractual change in the tariffs of the participating airlines, as filed with and accepted by the Civil Aeronautics Board. *See*, 31 Fed.Reg. 7302 (1966). The contractual modifications of the Montreal Agreement consisted of an increase in the limitation for liability, and a waiver of the due course defense in Article 20(1) by the carriers. No changes, substantive or otherwise, were made in Article 17, governing the pre-conditions for liability, since such a change would be an amendment to the treaty which would require ratification by the Senate. *See, Lowe v. United States*, 230 F.2d 664, 666 (9th Cir. 1956). Since the definition of the term "accident" was not altered by the Montreal Agreement, we must look to the language of Article 17 of the Warsaw Convention for the proper construction of that term.

Interpretation of a treaty cannot be governed by the local laws of the various states which comprise the Union. *United States v. Belmont*, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). Interpretation of a treaty is governed by the legislative history of the treaty (including the reports of the conferences and associated materials), subsequent acts of the contracting parties, and the pertinent legal interpretations promulgated by those courts which have jurisdiction. *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 337 (5th Cir. 1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). *See also, Choctaw Nation v. United States*, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943).

### 1. *Foreign Case Law*

Rule 44.1 of the Federal Rules of Civil Procedure provides the following with respect to issues involving foreign law:

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

*See, Burnett v. Trans World Airlines, Inc.*, 368 F.Supp. 1152, 1155–56 (D.N.M.1973). We believe it is appropriate to limit our inquiry to the case law of the United States only, a position concurred in by the parties to this litigation who cited only that body of law to us, and not that of any other signatory nation.

### 2. *United States Case Law*

*It is significant, however, that none of the cases that have been decided by state or federal courts have dealt with a factual situation in which an injury was caused during the course of a routine and normal flight.*

In *Berguido v. Eastern Airlines, Inc.*, 369 F.2d 874 (3d Cir. 1966), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1194, 20 L.Ed.2d 95 (1968) and *Block v. Compagnie Nationale Air France*, 386 F.2d 323 (5th Cir. 1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968), the incidents which led to the injuries were plane crashes. Neither of these cases turned on an interpretation of the word *"accident"* of Article 17. *Berguido* dealt with the Article 20(1) defense of due care. *Block* focused on the applicability of the Warsaw Convention to international air travel by charter groups.

Serious turbulence was found to be the cause of the injury in *Helfet v. Pan American World Airways, Inc.*, 12 CCH Aviation Rep. ¶ 17,247 (N.Y.Sup.Ct. Bronx County 1972). However, Plaintiff's negligence in not fastening her seat belt properly, even after the seat belt warning signs were on, was considered to be a contributory negligence defense under Article 21. None of these cases raised the issue of the occurrence of an *"accident"*; all dealt with de-

fendant's liability and alleged contributory negligence of plaintiff.

In *Husserl v. Swiss Air Transport Company,* 351 F.Supp. 702 (S.D.N.Y.1972), the court was asked to decide if hijacking constituted an accident. The court held that sabotage was covered under the post-Montreal Convention and concluded that acts of persons other than the airline or plaintiff were covered by the treaty. Thus, the airline was held liable even though identifiable independent acts caused the injury, including such extreme conduct as intentional terrorism. Several other courts have travelled the *Husserl* route. *See, Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152 (D.N. M.1973); *Rosman v. Trans World Airlines, Inc.* 34 N.Y.2d 385, 358 N.Y.S.2d 97, 314 N.E.2d 848 (N.Y.Ct.App.1974); *Herman v. Trans World Airlines, Inc.,* 12 CCH Aviation Rep. ¶ 17,304 (N.Y.Sup.Ct. Kings County 1972).

A terrorist attack on passengers waiting to board an airliner was the issue in *Evangelinos v. Trans World Airlines, Inc.,* 396 F.Supp. 95 (W.D.Pa.1975). The question presented was whether the Convention applied to an attack which was made on passengers waiting to complete pre-boarding security checks. Because the Court held that the term "embarkation" in Article 17 is limited to a circumscribed space both geographically and temporally, it concluded that the Convention did not apply. Hence, it did not reach the issue of whether a terrorist's attack constituted an "accident". However, there was dictum to the effect that intentional acts of third parties are "accidents" within the framework of Article 17. *Id.* at 100. The Court of Appeals, *en banc,* reversed the District Court on the issue of the meaning of the term "embarkment", but noted that the defendant did "not dispute the district court's conclusion that a terrorist attack on airline passengers is an 'accident' within the meaning of Article 17." *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152, 154 (3rd Cir. 1977) (*en banc*).

Two cases have dealt with injuries which apparently resulted from accidental falls.

In *Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611 (S.D.N.Y.1955), the plaintiff had already boarded the aircraft when she decided to take a last look from the doorway in order to wave a final farewell to her family. She chose an inopportune moment, however, as the moveable boarding stair had already been pulled back about a foot from the plane. Apparently she was unaware of this situation; when she stepped forward she fell to the ground. The court ruled that the Convention applied, even though the plane was not then in flight; it held that this incident was an "accident", in that it actually occurred either on board the plane or in the course of embarkation; recovery, however, was barred by the Article 21 defense of contributory negligence, and by the expiration of the two year statute of limitations created by Article 29(1) of the Convention.

In *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1971), plaintiff fell while standing in the baggage claim area of the terminal after a transatlantic flight. The Convention was held to be inapplicable, in light of the fact that the incident occurred at a point which was physically so remote from the aircraft itself. *But see, Evangelinos,* 550 F.2d at 156–157.

Quite apart from that issue, the court in *MacDonald* stated, however, that the facts did not establish the happening of an "accident" within the context of the applicable provisions:

We see no basis for finding an accident, the first requirement for invocation of the Convention. Plaintiff did show that there were bags in her vicinity when she fell. However, even if the jury could have found that the bags were so close that when she fell she fell over one of them, it would be speculation to say that it was the bag which caused the fall. The area was well lighted. Plaintiff fell forward, and any bag in front of her must have been clearly evident. More important, she was not going anywhere, and there is no reason to think she was proceeding across the floor. The burden was on plaintiff to prove there was an

accident. On the facts established it seems as reasonable to suppose that some internal condition was the cause of the fall as that the fall was the result of an accident.

*MacDonald, supra,* at 1404–05.

This excerpt brings two other problems into focus: (1), failure to show a causal relationship between any action of the carrier and the injury to plaintiff, and (2) the inapplicability of *res ipsa loquitur* to a situation in. which several causes may have caused the injuries. We agree with the *MacDonald* Court that an incident such as the one before it, which could just as likely have been the result of a fainting spell or other internal infirmity of the plaintiff, should not, without proof of abnormal external factors, be considered an "accident" for which the carrier is liable. Thus, even if we accept the rationale of *MacDonald,* it would not, given its most generous limits, sustain recovery in the case at bar.

It is also significant that all of the cited cases, with the exception of *MacDonald,* share the common characteristic of an "out-of-the ordinary", unanticipated incident as the immediate proximate cause of the injury. Even when an incident has involved intentional acts of third parties, (*Husserl, supra*), some unclassifiable event causing a crash (*Berguido, supra*), or a form of negligence such as removing the ramp while not blocking the doorway (*Chutter, supra*), the common thread has been a happening or an event which in each case was beyond the normal and preferred mode of operation for the flight. In the case at bar, however, we are faced with a causative link with an identifiable event—*a change in cabin pressure—which is part of the normal, anticipated and established mode of procedure.*

As previously noted, the matter appears to be one of first impression; given the factual context of the case, we will examine the "legislative history" of the Convention for further guidance.

### 3. *Documentary Materials on the Warsaw Convention*

The United States was the moving party for a change in the liability rules under the Warsaw Convention, a position clearly evidenced both by the Notice of Denunciation of 1965, and the text of the Montreal Agreement. The goal of the United States was to establish an international compensation system based upon the principles of absolute liability and limited compensation, thereby serving the interests of: (a) rapid settlement of disputes without the vexations and delays of protracted litigation; (b) a proportional diminution of legal fees; and (c) limited exposure for the carriers in the event of a major catastrophe. To a degree this was achieved by the Montreal Agreement, insofar as it covered United States nationals. However, that left the Convention with multiple compensation limits, and with a nontreaty modification. *See,* Statement of President of Council of International Civil Aviation Organization (ICAO) at Inaugural Meeting of Guatemala Protocol Conference on February 9, 1971, found in ICAO Doc. 9040–LC/167–1, Agenda Item # 1 at p. 5. Meetings were accordingly held by the ICAO during the period from 1966 to 1970; these led to the Convention held in Guatemala to consider amendments to the Warsaw Convention system. A pivotal aspect of those discussions involved possible liability systems; the proposals ranged from those of the United States which sought absolute liability with a compensation limit, to those of some of the other nations which sought a continuation of the existing Convention rule that would preserve the defense of due care under Articles 17 and 20(1). Finally, a compromise was reached under which Article 17 was revised to provide for absolute liability, and Article 22 was amended to increase the compensation limit to the equivalent of US $100,000. That portion of Article 17 relating to injuries sustained by passengers now reads as follows as a result of the agreement reached at the Convention:

1. The carrier is liable for damage sustained in case of death or personal injury of a passenger upon condition only that the event which caused the death or injury took place on board the aircraft or

in the course of any of the operations of embarking or disembarking. However, the carrier is not liable if the death or injury resulted solely from the state of health of the passenger.

A critical concern in connection with hammering out the revised language of Article 17 arose from the opposition to placing the airlines in the position of absolute insurers of the health of their passengers. *See,* e. g., Comments of the Delegates from New Zealand, Guatemala, Jamaica, United Kingdom, Ireland, Australia, and France, found in Minutes of Second Meeting of the Commission of the Whole, on February 10, 1971, ICAO Doc. 9040–LC/167–1, Agenda Item No. 9 at p. 31 (1971).

A cardinal principle of treaty construction dictates that resort be made to subsequent interpretations by the parties themselves in order to ascertain intent with respect to those matters which arise *in futuro* which are not specifically anticipated at the time of adoption. *Husserl, supra,* 351 F.Supp. at 702. The discussions which led to the Guatemala Protocol (one that was adopted by the member states, although not ratified by the United States Senate), as well as the language of the Protocol itself, provide us with the necessary tools to construe the intent of the parties. One portion of the report of the Subcommittee is illuminated with respect to the type of occurrence which was not to be construed as an "accident": "[a]n accident does not include death or illness from natural causes." *See,* Report of Subcommittee on Revision of the Warsaw Convention as Amended by the Hague Protocol, found in ICAO Doc. 8839–LC/158–1, Report, ¶ 7 at p. 2 (1969). The participants of the Guatemala Conference in 1971 were extremely conscious of their obligation to carefully select language that would accurately reflect their understanding. *See,* Comments of Delegates, *supra.*

In the discussions in 1969 relating to potential amendments to Article 20 (liability for damage to baggage), the Reporter, Dr. Swart, noted that the possibility of

making the carrier liable independent of the "risks of the air" (and independent of fault) is small, because the Convention requires that the damage to passengers should consist of *death or injury,* caused by an *accident,* which took place *on board of the aircraft,* etc. (see Article 17). Moreover the carrier has the possibility to prove contributory negligence on the part of the passenger.

By deleting Article 20 [due care exemption] in respect of passengers, one would therefore make the carrier only in exceptional cases liable for damage which is unrelated to the "risks of the air" and to which the carrier has in no way contributed by negligence, e. g. murder or infection by a fellow passenger or a heart attack (accident?).

8. In respect of *baggage and cargo* the connection with the "risks of the air" is much looser as a result of the fact that the Convention requires only an *"occurrence"* instead of an *"accident",* and that the special liability of the carrier also applies to baggage and cargo in charge of the carrier in an *aerodrome* (Art. 18). Moreover, baggage and cargo can be *lost or stolen.*

These differences are connected with another difference between passengers and property as subject of carriage: the fact that the majority of baggage and cargo claims concern individual cases or damage or loss, similar to those which may occur in carriage by other means of transport.

.        .        .        .        .

10. The easiest way to solve this difficulty would probably be to *limit* the *absolute liability* of the carrier to *aircraft accidents.* In so doing one would also provide for the (rare) cases mentioned above . . . in which absolute liability would be unjustified in respect of passengers. . . .

Rules of Liability in Respect of Baggage and Cargo in Warsaw Convention as Amended by the Hague Protocol, ¶ 17–10, at 2–3, found in ICAO Doc. 8839–LC/158–1, at 230–31 (1969) (emphasis in original). We

believe this statement of the Reporter to the subcommittee which deals with baggage and cargo liability presents an authoritative view that the term "accident" was to be interpreted in its common-sense meaning of an untoward event, out of the ordinary, triggered by some external event, in contrast to an occurrence which may come about under conditions of normal operation because of inherent weakness or disability, notwithstanding the absence of any extra-ordinary external force or event. Thus, if the event on board an aircraft is an ordinary, expected and usual occurrence, then it cannot be termed an accident. To constitute an accident, the occurrence must be an unusual or unexpected happening. Compare, *Leport v. White River Barge Line,* 315 F.2d 129 (3d Cir. 1963); *Caspar v. American Guarantee & Liability Ins. Co.,* 408 Pa. 426, 184 A.2d 247 (1962). The event or occurrence is not an accident if it results solely from the state of health of the passenger and is unconnected with the flight.

The Legal Committee of the ICAO adopted its final revisions to Article 17 on February 24, 1970. (*See,* Minutes, Agenda Item 3, ¶ 25, found in ICAO Doc. 8878–LC/162, Minutes of Twentieth Meeting, at 187, 192 (1970)). In the final debate before adoption, it was pointed out that the word "event" was substituted for "accident", thus broadening the scope of the Article; however, a sentence was added which excluded death or injury resulting solely from the infirmity of the passenger, in order to limit the coverage to carriage-related incidents. *Id.,* ¶¶ 2–25. The revised proposed Article 17 was then debated by the entire delegate body. Nominal changes were made in an effort to clarify textual inconsistencies between the three parallel official translations, so as to assure accurate interpretation of the specific intent of the drafting committee. *See, e. g.,* Minutes of Second Meeting of the Commission of the Whole, Agenda Item No. 9, Article 17, found in ICAO Doc. 9040–LC/167-1, Minutes of Guatemala Conference, at 31–38.

A statement made by the Delegate of the United Kingdom is particularly illuminating in this regard. He stated that his govern-ment could accept the principle of absolute liability, but then addressed himself to the question of the precision of the text of Article 17, as then proposed, particularly with respect to possible liability for such injuries as a heart attack brought about by fright from sudden severe turbulence:

> As to the second sentence, his Delegation had not been able to think of better wording. It was important to be very explicit so as to avoid any possibilities of litigation in proving whether death or injury was due solely to the infirmity of the passenger or whether the airline was at fault. It seemed to his Delegation that the present wording was precise and that any other wording might create possibilities of argument. With regard to the example which the Delegate of New Zealand gave, of the passenger with a weak heart whose death was precipitated by clear air turbulence, his Delegation felt that the airline should carry the responsibility, in border-line cases. He would be prepared to accept the present wording unless other Delegations had better ideas.

Minutes of Second Meeting, Agenda Item No. 9, *supra,* ¶ 7, found in ICAO Doc. 9040–LC/167-1, *supra,* at 32. This view was supported by the United States (*see, id.,* at ¶ 11), and by several other delegations, and appears to accurately express the ultimate consensus of the Convention.

It is significant that an incident such as that postulated by the United Kingdom delegate—a heart condition aggravated by un-anticipated, severe turbulence—would be a borderline case under the 1971 Guatemala Protocol, even though that Protocol did broaden the substantive rules for liability. Yet, it is clear under Article 17 that if the hypothetical passenger's heart condition were to have been aggravated by the acceleration required on take-off, or by the deceleration which occurs when landing, such an occurrence would not be an injury as the result of an "accident", even under the expanded provisions of Article 17.

## C. *Conclusion*

We therefore conclude that an injury of the type suffered by Mr. Warshaw, arising

as it did from ordinary, anticipated and required programmed changes in the aircraft's operation, all of which were performed purposefully under the careful control of the plane's crew in the normal and prudent course of flight control is not covered by the presently effective version of the Warsaw Convention, as amended by the Montreal Agreement.[5]

We emphasize the particular set of facts upon which this decision rests. Had the evidence established abnormality or malfunction in the operation of the aircraft, then we would have been presented with an entirely different situation. Instead, we find that the injury to plaintiff, regrettable as it is, is clearly one that was proximately caused during normal operation of a properly functioning aircraft, on an otherwise uneventful and ordinary flight. This is not an "accident" for which a carrier is liable under the Warsaw Convention, Article 17, and judgment accordingly will be entered in favor of defendant.

## IV. *CONCLUSIONS OF LAW*

1. Diversity of Citizenship exists between plaintiffs and defendant; the amount in controversy exceeds $10,000, exclusive of costs and interest, and this Court has jurisdiction under 28 U.S.C. § 1332.

2. Venue lies in this district; the contract for carriage was entered into here, and plaintiffs reside in this district.

3. This case is governed by the rules for international air transportation, set out in the Warsaw Convention, 49 Stat. 3000, as modified by the Montreal Agreement, 31 Fed.Reg. 7302 (1966).

4. Plaintiff Cyrus Warshaw suffered a bodily injury while on board Flight 756, a Boeing 707 operated by Trans World Airlines between Philadelphia and London.

5. Plaintiff's injury to his left ear was proximately caused by the repressurization of the cabin of Flight 756 as it descended for landing near London.

6. Because plaintiff's injury was caused by the normal repressurization of the aircraft cabin, in accordance with ordinary and routine operating procedures under conditions which were free of any malfunctions or abnormalities, that injury does not constitute an "accident", as that term is defined in Article 17 of the Warsaw Convention, as modified by the Montreal Agreement.

7. Because plaintiff has failed to establish an injury suffered on board an aircraft as a result of an "accident" within the meaning of Article 17 as modified by the Montreal Agreement, he has failed to sustain the burden of proof necessary for recovery.

An appropriate Order will issue.

---

5. To date, the Guatemala Protocol has not been ratified by the United States. Accordingly, we have applied the Warsaw Convention, as modified by the Montreal Convention, in this action.