**Joseph FULOP and Wanda Phillips, Plaintiffs,**

v.

**MALEV HUNGARIAN AIRLINES, Defendant.**

**No. 00 CIV.1965 (VM).**

United States District Court,
S.D. New York.

Oct. 29, 2001.

Kathleen L. Nastri, Carmody & Torrance, Waterbury, CT, for plaintiffs.

Stephen J. Fearson, Condon & Forsyth, New York City, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Joseph Fulop ("Fulop") and Wanda Phillips ("Phillips") instituted this action under the Warsaw Convention to recover damages for injuries Fulop allegedly sustained aboard an international flight operated by defendant Malev Hungarian Airlines ("Malev"). Malev moves for summary judgment, pursuant to Fed. R.Civ.P. 56, arguing that Fulop's injuries were not caused by an "accident" within the meaning of Article 17 of the Warsaw Convention and that Fulop's claim of willful misconduct does not state a cause of action separate from his Article 17 claim. The Court, having reviewed and considered the parties' submissions and oral arguments, grants the motion in part and denies the motion in part.

### FACTS

On March 18, 1998, Fulop was a passenger with Phillips, his wife, aboard Malev flight number 90 traveling from Budapest to JFK Airport ("JFK") in New York (the "Flight"). Shortly after takeoff, Fulop began experiencing chest pains similar to those he had experienced during a heart attack he suffered in 1994. Fulop took nitroglycerin in an attempt to alleviate the pain.

When the pain persisted, Fulop requested assistance from Malev flight attendants and asked them if a physician was on the plane. An announcement was made to see if a physician was aboard the plane who could examine Fulop. A passenger who was a doctor responded and examined Fulop, who had moved and was then lying in a row of empty seats toward the back of the plane.

Malev claims that its chief purser discussed with Fulop and the treating physician the possibility of diverting the Flight to land at an airport in Europe and that the doctor advised that Fulop's pulse was fine and that he did not know whether an immediate landing was necessary. *See* Defendant's 56.1 Statement, dated Mar. 6, 2001, ¶¶ 13, 14. In contrast, Fulop claims that he requested a diversion to England (*see* Compl., ¶¶ 13, 15; Plaintiffs' Memorandum in Opposition, dated Mar. 29, 2001 ("Plaintiffs' Memo"), at 5), but also claims that he only asked a flight attendant if the plane could land in England. *See* Plaintiffs' 56.1 Statement, dated Mar. 29, 2001, ¶ 6; Transcript from Fulop Deposition, dated Jan. 9, 2001, at 31.

The Flight was not diverted and landed at JFK. Malev personnel arranged for an ambulance to meet the aircraft upon its arrival. Paramedics examined Fulop after the Flight landed and took Fulop to Mary Immaculate Hospital. Fulop was transferred to Long Island Jewish Medical Center two days later where he underwent triple bypass surgery. Fulop now claims that his "permanent damage would not have occurred had Malev diverted the Flight to allow Mr. Fulop to receive appropriate treatment within the first several hours following the onset of his heart attack." Compl., ¶ 21.

### DISCUSSION

#### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The role of the Court is to determine whether

there are any genuine issues of material fact to be tried, not to decide them (*see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)), while resolving ambiguities and drawing all reasonable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden and is required to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [that] show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The party opposing the motion must then demonstrate—without relying solely on pleadings or conclusory factual allegations—that there exists a genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the opposing party must present specific evidence supporting its contention that there is a genuine issue of material fact. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). To show such a genuine dispute, the opposing party must proffer sufficient evidence to allow a reasonable jury to return a verdict in its favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## II. BACKGROUND

This case involves the meaning and usage of the common word "accident" in an uncommon sense. Ordinary as the term is, as defined and applied in the context of the Warsaw Convention,[1] it has engendered extensive debate and varying, sometimes contradictory court decisions. Not the least of this disaccord may be ascribed to interpretation of an international treaty whose original text is in a language other than English. However, as the United States Supreme Court noted in *Air France v. Saks*,[2] the legal meaning of the term in French, the language in which the original text of the Warsaw Convention was drafted, does not differ materially from the usage of the term in the United States, Great Britain or Germany.

One layer of complication to achieving broader consensus on the legal scope of the term arises because "accident" may mean the cause of an occurrence in one sense of the word, and in another, may connote the consequential injury itself.[3] As the Supreme Court observed:

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, reprinted in 49 U.S.C. § 40105 (hereafter, the "Warsaw Convention" or the "Convention").

2. 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

3. In ordinary language, two people inadvertently bumping into one another would readily agree that the incident was an accident. But if one deliberately punches or shoots the other, we are likely to say that there was no accident, suggesting that—at the most basic level of usage—some general understanding may exist concerning the meaning and consequences attached to the word "accident". *See generally* Gilbert Ryle, *Ordinary Language in Ordinary Language* 25 (V.C. Chappell ed., 1964) ("The edges of 'ordinary' are blurred, but usually we are in no doubt whether a

The word 'accident' is not a technical legal term with a clearly defined meaning. Speaking generally, but with reference to legal liabilities, an accident means any unintended and unexpected occurrence which produces hurt or loss. But it is often used to denote any unintended and unexpected loss or hurt apart from its cause; and if the cause is not known the loss or hurt itself would certainly be called an accident. The word 'accident' is also often used to denote both the cause and the effect, no attempt being made to discriminate between them.[4]

Underscoring the distinction between "accident" as cause and effect, the *Saks* Court promulgated a definition of "accident" for purposes of Warsaw Convention cases. The Supreme Court declared that the intent is to encompass the cause of an injury, rather than solely the injury or occurrence by itself, and that for Warsaw Convention liability to arise, the injury a passenger suffers on account of an accident must be "caused by an unexpected or unusual event or happening that is external to the passenger."[5]

Yet, despite the Supreme Court's endeavor to clarify the meaning of the term, to say that the results are far from clear would be an understatement. In the aftermath of *Saks*, disputes between passengers and airlines about events they respectively characterize as accidents have turned on their head the diametric positions each side previously advocated in cases involving similar injuries. Moreover, outcomes in some decisions ascribe to the concept of "accident" a counterintuitive meaning.

For example, in actions such as the one now before this Court involving heart attacks and other serious medical conditions travelers have suffered aboard aircraft, the litigating passengers—to escape application of the Convention's limitations on airline liability for covered damages—traditionally argued that the events producing the alleged injuries could not be classified as accidents.[6] Conversely, the airlines, to invoke the Warsaw Convention's limitations, have argued that the very same kinds of injuries constituted accidents and thus fell within the scope of the Convention's restricted liability.[7]

diction does or does not belong to ordinary parlance."). As discussed below, in the context of air carrier liability under the Warsaw Convention, these common understandings of "accident" do blur and sometimes what might be the ordinarily expected legal outcomes do not necessarily prevail. This phenomenon perhaps confirms that beneath its linguistic surface, the debate about the causes of an air travel "accident" more fundamentally implicates philosophical differences concerning the apportionment of effects.

4. *Saks*, 470 U.S. at 398, 105 S.Ct. 1338 (quoting *Fenton v. J. Thorley & Co.*, [1903] A.C. 443, 453).

5. *Id.* at 405.

6. *See Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1519 (11th Cir.1997) (where a passenger suffered heart failure while aboard an international flight and claimed that the carrier was negligent in responding to the emergency, the court observed that "[p]laintiffs ... urge us to hold that there was no 'accident' within the terms of the Warsaw Convention"); *Tandon v. United Air Lines*, 926 F.Supp. 366 (S.D.N.Y.1996) (in a case involving a heart attack suffered by a passenger during a flight, plaintiff argued that the passenger's death was not caused by an accident within the meaning of the Convention, while the airline argued that its alleged failure to provide adequate oxygen constituted an accident, as it was an unusual or unexpected event external to the injured passenger).

7. *See, e.g., Krys*, 119 F.3d at 1519 ("Lufthansa urges us to hold that a negligent response to a passenger's heart-attack symptoms constitutes an 'accident' under the terms of [*Saks* ]. In its

More recently, following the United States Supreme Court's decision in *El Al Israel Airlines, Ltd. v. Tseng*,[8] which held that the Warsaw Convention provides passengers the exclusive means of recovery for covered injuries and thus precludes relief for causes of action brought under state common law, the tables turned. The opposing sides then scrambled to redefine their respective positions. They switched sides and ended up advocating countervailing views on the meaning of an "accident" from the semantic corner the other had previously occupied.

As in the case at hand, passengers instituting similar claims now assert that their injuries stemming from medical conditions aggravated by occurrences during flight comprise accidents within the meaning of the Warsaw Convention. On the other hand, the carriers, which once maintained that these occurrences constituted accidents, now contend—to avoid liability altogether—that those types of injuries cannot be deemed to have been caused by accidents for which they may be held liable.[9] As further discussed below, the outcomes in these cases are divided. Some courts have held that the occurrences which caused the injuries may be classified as accidents, while others have concluded otherwise.

Similarly conflicting results are recorded in cases involving passenger-on-passenger assaults. A jury in one case, for instance, probably reflecting the common understanding of "accident" as an unintended occurrence, determined that a physical assault by one passenger against another was not an accident,[10] though airline personnel had been apprised of the attacker's already expressed aggression and had attempted to intervene. On similar fact patterns, courts have decided that certain passenger-on-passenger attacks may be considered accidents, even when the airline personnel had no awareness of the assault and little or no role in it and perhaps only limited ability to prevent it.[11]

Oddly prominent within this maze of perplexities, in another category of cases, the courts generally hold that the most deliberate of all acts of aviation injuries—criminal violence, including bombings and even murder, committed by hijackers or terrorists—constitute Warsaw Convention "accidents" that entitle harmed passengers to hold the airlines liable.[12] But alleged

view, aggravation of a preexisting condition due to crew negligence is *ipso facto* an injury caused by an 'unexpected or unusual event ... external to the passenger.' ").

8. 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking' ... if not allowed under the Convention, is not available at all").

9. *See McDowell v. Continental Airlines, Inc.*, 54 F.Supp.2d 1313 (S.D.Fla.1999) (plaintiff, having experienced a heart attack during a flight, claimed the injury he suffered by the carrier's deficient response to the emergency was caused by an accident covered by the Convention; defendant airline argued that the acts and events causing the injury at issue did not constitute an accident); *see also Husain v. Olympic Airways*, 116 F.Supp.2d 1121 (N.D.Cal.2000) (similar arguments concerning injury to passenger from effects of secondhand smoke on his asthma allegedly caused by the carrier's failure to change the passenger's seat assignment).

10. *See O'Grady v. British Airways*, 134 F.Supp.2d 407 (E.D.Pa.2001).

11. *See, e.g., Wallace v. Korean Air*, 214 F.3d 293 (2d Cir.2000); *Lahey v. Singapore Airlines, Ltd.*, 115 F.Supp.2d 464 (S.D.N.Y.2000).

12. *See, e.g., Pflug v. Egyptair Corp.*, 961 F.2d 26 (2d Cir.1992) (hijacking); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3d Cir.1977) (same); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975), *cert. denied*,

negligent actions or complete inaction by airline personnel that have had the effect of aggravating a heart attack or other physical ailment from which the passenger then suffers more severe injuries or dies have not been deemed "accidents" covered by the Convention.[13]

This judicial disarray and the anomalies it has engendered serve as the context in which this Court is now called upon to consider anew an issue already exhaustively treated in other cases and to decide whether a basis exists entitling Fulop to hold Malev liable for injuries aggravated as a result of the heart attack he suffered while on board the Flight.

Resolution of this action ordinarily should be a rather straightforward and easy matter. The precise dispute presented here has been dealt with in other cases. Courts in several circuits, including two district courts in the Second Circuit, have concluded, under fact patterns similar to the one in this action, that a passenger's injuries arising from the effects of a heart attack or other illness suffered during a flight and the airline crew's failure to respond with adequate medical assistance, did not arise from an accident within the meaning of the *Saks* definition, and thus that the passengers were not entitled to recover from the carriers under the Warsaw Convention.[14]

The weight of that authority would suggest no need to tarry any longer in the bewilderment of what events qualify as accidents under the Convention. But this judge has learned, even on the experience of a relatively brief time on the bench, that there are no slam dunks in the law. Consequently, the Court considers it necessary to treat the issues more extensively.

The backdrop supplied above, in addition to permitting a fuller understanding of the issues in context, may assist in confirming that in fact the underlying issue is by far not free from doubt and that substantial latitude for reasonable differences of opinion still exists. Within this fair ground for disagreement, this Court feels compelled to diverge from significant authority because it finds circumstances that distinguish earlier precedent from the case before it, as well as other reasons it deems sufficient to warrant a departure from relevant case law.

## III. *PERSPECTIVES ON THE WARSAW CONVENTION*

Article 17 of the Warsaw Convention describes the circumstances under which air carriers may be held liable for injuries to passengers occurring in the course of international travel. It provides that

> [t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the

---

429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976) (terrorist attack); *Salerno v. Pan American World Airways, Inc.*, 606 F.Supp. 656 (S.D.N.Y.1985) (bomb threat).

**13.** *See, e.g., Krys*, 119 F.3d 1515; *Abramson v. Japan Airlines Co., Ltd.*, 739 F.2d 130 (3d Cir.1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *Rajcooar v. Air India Ltd.*, 89 F.Supp.2d 324 (E.D.N.Y. 2000); *McDowell*, 54 F.Supp.2d 1313; *Tandon*, 926 F.Supp. 366; *Walker v. Eastern Air Lines, Inc.*, 775 F.Supp. 111 (S.D.N.Y.1991);

*Fischer v. Northwest Airlines, Inc.*, 623 F.Supp. 1064 (N.D.Ill.1985). *See also Carey v. United Airlines*, 255 F.3d 1044, 1048 (9th Cir.2001) ("[Plaintiff's] argument assumes that the term 'accident' in Article 17 is defined by its everyday meaning—something caused by carelessness, but not caused on purpose. However, an 'accident,' as that term is defined for purposes of the Warsaw Convention, can include intentional misconduct.").

**14.** *See* cases cited *supra*, n. 13.

aircraft or in the course of any of the operations of embarking or disembarking.[15]

In defining "accident" as an unexpected or unusual event or happening external to the passenger, the *Saks* Court instructed that this definition "should be applied flexibly after an assessment of all the circumstances surrounding a passenger's injuries."[16]

Courts which have grappled with the application of Article 17, both before and after *Saks*, have weighed several factors in determining whether particular events that allegedly caused passenger damages constituted accidents. These considerations focus on the relationship of the claimed accidents to (1) the normal operations of the aircraft or airline; (2) the knowledge and/or complicity of crew members in the events surrounding the alleged accident; (3) the acts of fellow passengers, whether intentional or not; (4) the acts of third persons who are not crew or passengers, *e.g.*, hijackers and terrorists; (5) the location of the occurrence in the continuum of air travel; (6) the role, condition and reaction of the complainant in connection with the occurrence at issue; and (7) the kinds of risks inherent in air travel.[17]

Insofar as any decisive pattern may be discerned, the fulcrum of these considerations often rests on the extent to which the circumstances giving rise to the claimed accident fall within the causal purview or control of the carrier—or at least within its practical ability to influence—as an aspect of the operations of the aircraft or airline.[18] The larger the role of the airline in the causal chain, and the greater the knowledge and involvement of its personnel and operations in bringing about the harmful event, the more likely it is that liability will be found.

Conversely, as the causal balance shifts towards acts and conditions that are independent of the knowledge or will of the carrier, or not associated with the operation of the aircraft or airline nor arising from risks characteristic of air travel, and instead are more unique to the passenger alleging injury, the lesser the claimant's probability of recovery.[19] In practice,

---

**15.** *See* 49 Stat. 3018.

**16.** *Saks*, 470 U.S. at 405, 105 S.Ct. 1338.

**17.** *See, e.g.*, cases cited *supra*, nn. 10–13 and *infra*, nn. 18, 19, 30, 37.

**18.** *See Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 70–71 (1st Cir.2000) ("Where the airline personnel play no causal role in the commission of the tort, courts have found no Warsaw accident.... On the flip side, courts have found Warsaw accidents where airline personnel play a causal role in the passenger-on-passenger tort.") (citations omitted); *Maxwell v. Aer Lingus Ltd.*, 122 F.Supp.2d 210, 213 (D.Mass.2000).

**19.** *See generally Saks*, 470 U.S. at 404–06, 105 S.Ct. 1338; *Sethy v. Malev–Hungarian Airlines, Inc.*, No. 98 Civ. 8722, 2000 WL 1234660, at *4 (S.D.N.Y. Aug.31, 2000), *aff'd*, 2001 WL 668586, 13 Fed.Appx. 18 (2d Cir. 2001); *Curley v. American Airlines, Inc.*, 846

F.Supp. 280, 283 (S.D.N.Y.1994); *Price v. British Airways*, 91 Civ. 4947, 1992 WL 170679, at *3 (S.D.N.Y. July 7, 1992); *Margrave v. British Airways*, 643 F.Supp. 510, 511–12 (S.D.N.Y.1986); *Warshaw v. Trans World Airlines, Inc.*, 442 F.Supp. 400, 411 (E.D.Pa.1977). Compare *Potter v. Delta Air Lines, Inc.*, 98 F.3d 881, 883–84 (5th Cir. 1996) (no "accident" where the alleged injury arose from an altercation between two passengers without any involvement of flight crew); *Stone v. Continental Airlines, Inc.*, 905 F.Supp. 823, 827 (D.Haw.1995) (same); *Price*, 1992 WL 170679 (same) with *Langadinos*, 199 F.3d at 70 (accident occurred where a passenger, allegedly appearing intoxicated and already aggressive, was served more drinks by the flight attendant and subsequently assaulted plaintiff); *Tsevas v. Delta Air Lines, Inc.*, No. 97 Civ. 320, 1997 WL 767278 (N.D.Ill.Dec.1, 1997) (finding injuries were caused by an "accident" where assault by one passenger on another occurred after the flight

however, a more precise point of demarcation defining an accident is hard to fix and apply, perhaps a product of some conceptual undertows running through the case law.

Neither the text of Article 17, nor the Supreme Court's definition of the term "accident" in *Saks*, makes reference to any requirement of a causal connection by the carrier to the unexpected event that brought about the traveler's harm or loss. The Convention requires only that the alleged injury result from an accident and is silent as to any additional causal attribution to any particular person or source. As is apparent on the face of Article 17, the Convention's only conditions for defining liability relate to time, place, type of injury and the nature of the cause, without further specifying that the carrier necessarily must have some causal role in the accident.

Similarly, the *Saks* definition makes no mention of a requirement of any degree of connection by the airline as a causal link to the accident. In fact, the Supreme Court implicitly reinforced the point when it stated: "Any injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger."[20]

The application of *Saks*'s construction of what comprises an "accident" within the meaning of Article 17 has split the courts into two camps. Some take an expansive view, holding that the flight crew's lack of involvement in the circumstances comprising the accident or the event's relationship to the operations of the aircraft may be irrelevant.[21] This approach finds "accidents" arising from events deemed unexpected or unusual, even when the carrier's causal role in the occurrence or the connection of the accident to some aspect of operations of the aircraft or airline may be minimal,[22] and even when the injuries were brought about by an intentional passenger-on-passenger assault and the carrier ostensibly had taken ostensibly reasonable measures to avert the incident.[23] Thus, if a passenger is injured by his slip and fall or by another passenger's fall, some courts have deemed the events accidents under Article 17, even though the occurrence may have been unrelated to the operation of the aircraft or to the conduct of the carrier's personnel.[24]

This view would imply imposition of a broad regime of strict liability on the carriers for almost any injuries attributed to an

attendant excessively served drinks to the attacker and refused to intervene or to change plaintiff's seat assignments). *See also Schneider v. Swiss Air Transp. Co., Ltd.*, 686 F.Supp. 15, 17 (D.Me.1988) (finding "accident" where plaintiff was injured in moving from her seat when another passenger refused to put his seat upright and flight crew denied assistance).

**20.** *Saks*, 470 U.S. at 406, 105 S.Ct. 1338.

**21.** *See, e.g., Gezzi v. British Airways PLC*, 991 F.2d 603, 605 n. 4 (9th Cir.1993) (noting that "[i]t is not clear whether an event's relationship to the operation of an aircraft is relevant to whether the event is an 'accident'"); *Lahey*, 115 F.Supp.2d at 467 (noting that "the

actions of the crew are not relevant to the determination of whether the assault was an 'accident' because it is clear that nothing in the term 'accident' suggests a requirement of culpable conduct on the part of the airline crew").

**22.** *See id.; Maxwell*, 122 F.Supp.2d 210.

**23.** *See, e.g., Lahey*, 115 F.Supp.2d 464.

**24.** *See Gezzi*, 991 F.2d 603 (passenger falling while walking from the gate to the plane); *Barratt v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, No. 88 Civ. 3945, 1990 WL 127590 (E.D.N.Y. Aug.28, 1990) (passenger falling down on stairs during embarkation).

unusual or unexpected happenstance occurring during or in preparation for air transportation. In fact, the courts have labeled the carrier's risks as grounded on "nearly absolute" or "virtual strict liability".[25] This expansive view draws some support from reference to the Montreal Agreement of 1966, a protocol under which carriers agreed—with respect to flights originating, stopping or terminating in the United States—to waive their right under Article 20(1) of the Warsaw Convention to assert, as a defense against passenger damages claims, that the airline took all necessary measures to avoid the injuries.[26] Yet the Supreme Court, also in *Saks*, cautioned against the concept that Article 17 imposes absolute liability under all circumstances,[27] compelling "an inquiry into the nature of the event which *caused* the injury rather than the care taken by the airline to avert the injury."[28]

Another perspective reflected in the cases espouses a narrower reading of the concept of "accident".[29] In this camp, decisions find no liability in situations where the circumstances indicate no causal involvement or relationship of the carrier in the events constituting the alleged accident, as demonstrated by the absence of evidence of any abnormal aircraft operations; departures from recognized industry standards, carrier policies or procedures; or aberrant conduct of employees in some way related to the operation of the aircraft or airline.[30] In these situations,

25. *See Wallace*, 214 F.3d at 297; *Margrave*, 643 F.Supp. at 515.

26. The Montreal Agreement did not amend the Convention, for it was not an international treaty requiring ratification by the parties. Rather, it was a contractual change in applicable tariffs voluntarily undertaken by the participating air carriers as a means of responding to a formal denunciation of the Convention announced by the United States in November 1965 on account of American dissatisfaction with the amount of limitation on liability then existing ($16,600.00). In accordance with the Montreal Agreement, airlines increased this limitation to $75,000.00 and agreed to waive the due care defense contained in Article 20(1) of the Convention. No substantive changes were made in the prerequisites for liability under Article 17. *See Warshaw*, 442 F.Supp. at 408.

27. Observing that because the "due care" defenses are waived by the Montreal Agreement the Ninth Circuit and some commentators had characterized the Agreement as imposing absolute liability, the *Saks* Court remarked: "As this case demonstrates, the characterization is not entirely accurate.... Under the Warsaw Convention as modified by the Montreal Agreement, liability can accordingly be viewed as 'absolute' only in the sense that an airline cannot defend a claim on the ground that it took all necessary measures to avoid the injury." 470 U.S. at 407, 105 S.Ct. 1338.

28. *Id.* (emphasis in original).

29. The First Circuit, declaring that the Supreme Court generally construes Article 17 "parsimoniously", noted that restraint in applying the definition of accident "is entirely understandable as Article 17 provides for strict liability, and there are sound policy reasons to confine that liability to the letter of the text, narrowly construed." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 316 (1st Cir.1995).

30. *See, e.g., Maxwell*, 122 F.Supp.2d at 213; *Gotz v. Delta Airlines, Inc.*, 12 F.Supp.2d 199 (D.Mass.1998) (finding no accident where a passenger was injured by another engaged in removing an overhead bag, where there was no failure by the flight attendant to intervene and no request for assistance); *Price*, 1992 WL 170679. *But cf. Pittman v. Grayson*, 869 F.Supp. 1065, 1070 (S.D.N.Y.1994), *aff'd*, 149 F.3d 111 (2d Cir.1998), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999) (finding no accident, because the events did not constitute risks inherent in air travel, even though plaintiff alleged that airline personnel had assisted in smuggling and transporting a passenger on a flight out of the country in violation of a court order); *Curley*, 846 F.Supp. 280 (no accident even where plaintiff claimed that the flight captain falsely identified him to Mexican police officials as having smoked marijuana while aboard the aircraft,

the courts stress that occurrences outside the airline's control or ability to prevent, or that are not related to hazards inherently associated with aviation, but rather are risks incident to "living in a world such as ours," [31] may not be classified as accidents under the Convention.

The question of the air carrier's causal involvement in the events claimed to be an accident was not explicitly addressed by *Saks*,[32] for the Court characterized the issue the case presented as a narrow one: whether "[plaintiff Saks] can meet [her burden of proof] by showing that her injury was caused by the normal operation of the aircraft's pressurization system".[33] The Supreme Court, rejecting the Ninth Circuit's reasoning that equated the "occurrence" with the "accident", held that Saks did not meet this burden because "it is the cause of the injury that must satisfy the definition rather than the occurrence of the injury alone." [34]

Implicit in the decision is that a different outcome would have been obtained had Saks in fact established that the operation of the aircraft's cabin pressure system was not normal, causing her hearing loss. Because neither the malfunctioning of the aircraft nor other abnormal operation or procedure were in dispute, the Court was not called upon to address whether a causal link between the carrier and the alleged accident was a prerequisite to Article 17 liability, thus lending further and fertile ground for the conceptual rift among the courts concerning the issue.

Assessing events under a standard which imposes "virtual strict liability" that is not altogether absolute and that must be weighed in light of the Supreme Court's mandate that the term "accident" should be construed flexibly and broadly presents the courts with uniquely delicate challenges. It demands drawing many fine lines and navigating through rather narrow, penumbral straits.[35] Responding to the challenge, some courts have propounded an approach that, focusing from the perspective of what actually happened to the injured passenger, endeavors to pinpoint causation through a purely factual description of events that produced the injury or its aggravation, rather than on assertion of negligence or other contributing acts or omissions of the airline personnel.[36] In charting a course to the proper

resulting in plaintiff's alleged injuries from detention and search by the Mexican police; the court concluded that being suspected and falsely accused of smoking marijuana in the airplane's lavatory was not a risk inherent in air travel).

**31.** *Martinez Hernandez v. Air France*, 545 F.2d 279, 284 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977) (rejecting an argument that a terrorist attack within an airport was a "characteristic of air travel" to which Article 17 liability should apply).

**32.** *See Wallace*, 214 F.3d at 299 (noting that the *Saks* court did not address whether an event must relate to air travel to be an Article 17 "accident"); *Gezzi*, 991 F.2d at 605 n. 4.

**33.** *Saks*, 470 U.S. at 396, 105 S.Ct. 1338.

**34.** *Id.* at 399, 105 S.Ct. 1338.

**35.** *See Saks*, 470 U.S. at 406, 105 S.Ct. 1338 ("We recognize that any standard requiring courts to distinguish causes that are 'accidents' from causes that are 'occurrences' requires drawing a line, and we realize that 'reasonable [people] may differ widely as to the place where the line should fall.' ") (quoting *Schlesinger v. Wisconsin*, 270 U.S. 230, 241, 46 S.Ct. 260, 70 L.Ed. 557 (1926) (Holmes, J., dissenting)).

**36.** *See Krys*, 119 F.3d at 1521–22 (noting that "ultimately we are convinced that the proper approach is indeed to look at a purely factual description of the events that allegedly caused the aggravation injury suffered by the plaintiff ... as opposed to an assertion of 'crew negligence' ").

rule of law to apply to resolve the dispute before it, this Court is more persuaded by the reasoning in the cases that mark the line at the point requiring some causal relationship between the claimed Article 17 accident and the operation of the aircraft or airline or the conduct of the carrier's employees.[37]

This perspective better accords with the reasoning in *Saks;* with the Supreme Court's observation there that not all air flight incidents causing injuries constitute accidents under the Warsaw Convention; and with its further admonition that the treaty did not countenance the most rigid form of absolute liability.[38] In reversing the Ninth Circuit's interpretation that equated an "occurrence" with an "accident", the Supreme Court specifically rejected the expansive concept of Article 17 strict liability that would have permitted recovery regardless of the absence of any role by the air carrier in causation.

To underscore the definition it enunciated, the *Saks* court declared that "[w]hen the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected *operation of the aircraft,* it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." [39] By implication, therefore, it is to some "operation of the aircraft" that the passenger's injury should relate, and it is only the unusual, abnormal and unexpected "operation of the aircraft" that would constitute an Article 17 accident.

This reading also comports with the intended purposes and policies embodied in the Warsaw Convention. Among the Convention's primary objectives are "to foster uniformity in the law of international air travel" and to limit potential air carrier liability for injuries to passengers so as not to discourage financial investment in the air transportation industry.[40] A comple-

**37.** *See Sethy,* 2000 WL 1234660, at *4 (holding that passenger's tripping over suitcase in the plane's aisle was not an Article 17 accident, the court noted that "plaintiff cannot point to any act or omission by the airline's crew or passengers that could have caused his alleged injury"); *Gotz,* 12 F.Supp.2d at 204 ("An event cannot fall within the operation of the aircraft if that event is not within the airline's purview or control."); *Tsevas,* 1997 WL 767278, at *3 (flight attendant's failure to respond to requests for assistance against a passenger's assault relates to the normal operations of the aircraft); *Stone,* 905 F.Supp. 823 (holding that a passenger's unprovoked attack on another did not qualify for recovery under Article 17 because the Convention requires the alleged accident to bear some relation to the operation of the aircraft); *Levy v. American Airlines,* No. 90 Civ. 7005, 1993 WL 205857, at *4 (S.D.N.Y. June 9, 1993), *aff'd,* 22 F.3d 1092 (2d Cir.1994) (finding that injuries passenger suffers during flight "must bear some relation to the [carrier's] operation of the aircraft" for Article 17 liability); *Price,* 1992 WL 170679 (same).

**38.** *See Saks,* 470 U.S. at 407, 105 S.Ct. 1338; *see also Margrave,* 643 F.Supp. at 515 ("Since

liability under the Convention is nearly absolute, courts should be wary of reckless invocation of the Convention by eager but undeserving litigants."); *Gotz,* 12 F.Supp.2d at 204 ("To hold otherwise would be to effectively construe the Convention as a statute imposing absolute liability for any harmful occurrence on an international flight. There is neither a reason nor authority for such a construction.").

**39.** *Id.* at 406, 105 S.Ct. 1338 (emphasis added).

**40.** *Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 230, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); *see Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991); *Wallace,* 214 F.3d at 296. This Court's research indicates that courts in several other countries have adopted the *Saks* definition of "accident". At least one court, in a case involving injuries to passengers caused in part by the flight crew's departures from the airline's procedures, applied an approach similar to that which this Court has adopted in the case at bar. *See Goldman v. Thai Airways Int'l, Ltd.,* (1981) 1

mentary end is "to accommodate or balance the interests of passengers seeking recovery for personal injuries, and the interests of air carriers seeking to limit potential liability." [41]

The Montreal Agreement adjusted the distribution of risks and interests by raising the cap on carriers' liability per passenger injury to $75,000.00 and requiring the airlines to waive their fault-based "due care" defense contained in Article 20(1) of the Convention. Presumably, the modified arrangement was thereby to guarantee to injured passengers the prospect of quicker and less expensive resolution of their claims.[42]

But while the carriers agreed to abandon their right to assert the absence of culpability as a defense, nothing in the text or negotiating history of the Convention or the Montreal Agreement suggests that the carriers correspondingly also forfeited all role in causation as an element of liability.[43] It is elementary that fault does not necessarily equate to cause; the concepts are distinct.[44] Certain actions may precipitate an accident, and the actor may be deemed to have had a sufficient link in the chain of causation to warrant imposition of liability, though he may have exercised all due care.

An unusual and unexpected happening arising in the course of air travel need not rest on any notion of negligence or fault to be actionable, as long as the element of abnormality relates in some discernible way to the inappropriate or unintended happening arising in connection with or during the course of operation of the aircraft or airline.[45] This distinction may lie behind the Supreme Court's rejection in *Saks* of the more expansive concept of accident that would have imposed a broader regime of absolute liability on air carriers.

Stripping the carrier of a resort not only to the absence of fault, but to some role in causation as a framework for Article 17 recovery, would effectively produce a regime of absolute liability comparable to that applicable to ultrahazardous activities—as in the common law doctrine governing recovery for injuries arising from blasting and attacks by dangerous animals, where the liability attaches strictly to engaging in the inherently risky activity.[46] Applied to air carriers, such a notion of liability would reach far beyond what the framers of the Warsaw Convention envisioned, rendering the airlines as absolute insurers—the very outcome the *Saks* Court eschewed.[47]

WLR 1186, 3 All ER 693 (finding an "accident" where captain deviated from standard procedure by failing to inform passengers to wear·their seat belts while flying through extreme turbulence causing passenger to suffer lower spine injury and by failing to divert the flight after the injury, landing more than four hours after the injury took place).

41. *Tseng*, 525 U.S. at 170, 119 S.Ct. 662.

42. *See Wallace*, 214 F.3d at 297.

43. The notion that the claimed accident should relate in some manner to the operation of the aircraft is traced to the treatise of Professor D. Goedhuis, who served as the reporter for the drafting of the Warsaw Con-

vention. *See Gotz*, 12 F.Supp.2d at 203–04 (noting that "most courts have, in fact, adopted [Professor Goedhuis's] interpretation of the word 'accident' ").

44. *See* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 75 (5th ed.1984).

45. *See Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 143 (2d Cir.1998).

46. *See Prosser and Keeton on Torts*, §§ 76, 78.

47. *See Saks*, 470 U.S. at 407, 105 S.Ct. 1338; *Gotz*, 12 F.Supp.2d at 204.

Under the fact pattern and the parties' respective positions encountered in *Saks*, therefore, the event that caused the plaintiff's injury was not brought about by anything related to any operation of the aircraft or the carrier, or to any conduct of airline employees that could reasonably be deemed unusual or unexpected. Nothing happened during the otherwise ordinary flight that involved actions of anyone, except the passenger herself and her atypical internal reaction to normal changes in the plane's cabin pressure.

The airline was not apprised before or during the occurrence that the passenger had suffered some effect related to the flight that might have called for some suitable response within the purview or control of the flight crew and that in some discernable way might have rendered the flight other than routine or normal. In sum, as was the case in other similar occasions where courts found no accident,[48] the incident did not demand any act of judgment, exercise of control or application of carrier operation that, regardless of fault, implicated the airline in some abnormal, unusual or unexpected role as a causal agent of the injury, or in a risk reasonably associated with aviation which, if known, the carrier could reasonably assume and insure against.[49]

In apportioning the balance of interests and the distribution of air travel risks, the *Saks* outcome achieves the purposes of the Warsaw Convention insofar as it places liability on the carrier only for accidents produced by causes within the scope of operations of the aircraft or the airline, *i.e.*, those over which the carrier may have some measure of control and ability to insure against. The air carrier, on the other hand, could not be reasonably expected to anticipate and protect against every cause of injury which results solely from a traveler's internal reaction to normal flight operations or other like conditions peculiar to or uniquely known only by a particular passenger. By the same token, liability for accidents whose proximate ties to causation may be traced to some deviation from normal aircraft or airline operation or procedure would place the burden on the party best situated to know what went wrong, and most able to control, prevent and insure against the eventuality.[50]

## IV. *APPLICATION OF PRINCIPLES*

■ The Court now turns to the application of the principles and reasoning suggested by the foregoing analysis to the case at hand. In so doing, this Court concludes that granting Malev's motion for summary judgment would be inappropriate. Read in the light most favorable to Fulop as the non-movant, the unusual or unexpected event or happening that occurred here which caused the accident was not Fulop's heart attack, or his internal reaction to the normal operation of the aircraft. Rather, it may be viewed as the alleged aberrant conduct of Malev's employees in handling the occurrence, the failures of which aggravated Fulop's initial heart attack.

In other words, Fulop suffered an initial injury caused entirely by his own internal condition and unrelated to the operation of

**48.** *See, e.g., Gotz,* 12 F.Supp.2d 199; *Walker,* 775 F.Supp. 111; *Margrave,* 643 F.Supp. 510; *Warshaw,* 442 F.Supp. 400.

**49.** *Maxwell,* 122 F.Supp.2d at 213 ("Liability for injuries resulting from that risk [terrorism] is allocated to the carrier for the simple reason that the carrier is in a far superior position than are passengers to institute protective safeguards.") (citing *Day,* 528 F.2d at 34).

**50.** *See id.*

the aircraft. But the relevant injury caused by an alleged "accident" was not the initial heart attack which plaintiffs concede (*see* Transcript from Oral Argument, dated May 31, 2001 ("Tr."), at 10 ), but the subsequent aggravated harms, for Fulop also may have suffered additional complications and graver injuries proximately attributable to the flight crew's conduct that conceivably would not have occurred had the carrier's personnel adhered to established operational standards, rules or policies applicable to the circumstances.

Fulop alleges that in responding to the situation the airline's pilot and flight crew members did not comply with Malev's own operations and procedures, leading to the delay in obtaining medical attention that ultimately was a proximate cause of the accident that produced his pertinent injuries. *See* Plaintiffs' Memo at 6. Fulop further argues that the Flight crew failed to follow expected standard procedure and that the failure was an unexpected, unusual event. *See* Tr. at 13–14. Simply put, Fulop contends that "Malev's failure and/or refusal to divert the Flight for Mr. Fulop's medical emergency was an unexpected or unusual event or happening that was external to Mr. Fulop." Compl., ¶¶ 21–22.

 Plaintiffs' counsel clearly articulated this theory of recovery:

> there are normal standard procedures that would be followed in the event of a medical emergency and those standard procedures include diverting the flight.
>
> \* \* \* \* \* \*
>
> what they had was a medical emergency for which there was a usual and expected response, which would be to divert the flight, and they didn't do it and therefore under the fact pattern adopted by the plaintiff, this is an accident because what they didn't do is they didn't

follow the normal expected procedure that a flight crew would follow if they are properly following procedures under the circumstances. And from the plaintiff's perspective, your Honor, that creates an accident within the terms of the Convention.

> \* \* \* \* \* \*

> What I am saying is in this case Mr. Fulop's complaints were not addressed in the ordinary, usual and customary way that the airline should have addressed them.... But if there is an accident because the flight crew has failed to follow usual and customary procedures, then the passenger does have recourse under the Warsaw Convention.

Tr. at 13–14, 15–16.

In response, Malev claims that its personnel acted appropriately in all respects and that neither the captain nor any of the crew deviated in any way from normal operations or procedures in dealing with a passenger who becomes ill on board an aircraft. *See* Tr. at 10. Malev's captain has averred that the Flight was not a situation involving "an acute medical emergency which required me [as the Captain in Command] to consider landing some place other than JFK, nor was it a situation where the basic course of the flight had to be altered in any way." Affidavit of Janos Werner, sworn to Feb. 6, 2001, ¶ 13; Defendant's Rule 56.1 Statement, dated Mar. 6, 2001, ¶ 15. These contentions create genuine issues of material facts precluding summary judgment.

The Court cannot accept Malev's argument that, in the context of the flexible application of the definition of "accident" that *Saks* commands, an assessment of all the circumstances surrounding Fulop's injuries does not support a finding that the events causing the injuries in question satisfy the definition of "accident" under Arti-

cle 17. To be sure, that Fulop's initial heart failure occurred during a flight and was unrelated to the operation of the aircraft, by itself would not qualify as an unusual or unexpected happening. Any person suffering from a preexisting heart condition may be vulnerable to be stricken at any time and anywhere, and there is no evidence here that the onset of Fulop's initial attack was precipitated by any abnormal happening related to the flight.

This Court is not persuaded, however, that a carrier's alleged violation of its own operations and procedures in handling an emergency when it did occur and the alleged attendant delay in obtaining adequate medical care that may ensue when the occasion arises, could objectively be deemed normal, usual or expected. To the contrary, by definition a measure of normal is adherence to norms; conversely, what is aberrant reflects departure from the norm at issue. Any major deviation from a standard articulated in recognized practices and procedures represents the exceptional case—the unusual or unexpected happening.

In and of itself, the incident of a traveler suffering a heart attack during flight, whatever the triggering event, is far from routine. It requires no citation to statistics to say that such occurrences are rare and that they demand correspondingly extraordinary responses. It also requires no reliance on authority to assert that, viewing the circumstance objectively as the *Saks* inquiry demands, the ordinary travel-er reasonably would expect that—as the normal, usual and expected response to such urgencies, and as a fair balancing of interests and risks characteristic of air travel—in handling life-threatening exigencies, airlines rendering services as common carriers would be particularly scrupulous and exacting in complying with their own industry norms, internal policies and procedures, and general standards of care.[51]

In this Court's view, injuries possibly resulting from an air carrier's significant departure from applicable procedures in responding to passenger emergencies relates to aircraft or airline operations and may have a sufficient causal bearing to the circumstances surrounding a resultant injury to support liability under the Warsaw Convention. Consequently, Malev's alleged deviation from its own rules and standards that were in place to deal with passengers stricken by medical emergencies may be sufficient to support a determination that such an event—the relevant occurrence properly here at issue—was unusual or unexpected, and thus an accident within *Saks*'s interpretation of the Convention's Article 17.

Malev cites rulings by courts in the Third, Seventh and Eleventh Circuits[52] and of district courts in this Circuit[53], which have held otherwise in similar cases involving passengers stricken by heart failure or other major illness during flight. In *Krys*, the passenger suffered a heart

---

**51.** *See Husain,* 116 F.Supp.2d at 1132 (in ruling that the events causing the accident that fatally aggravated the passenger's asthma was the flight attendant's repeated failure to respond adequately to the passenger's request for assistance in a seat reassignment, the court concluded that the unusual and unexpected occurrence was the crew member's violation of a recognized industry standard of care and disregarding the airline's own policies).

**52.** *See Krys,* 119 F.3d 1515; *Abramson,* 739 F.2d 130; *McDowell,* 54 F.Supp.2d 1313 (following *Krys* while expressing strong reservations); *Fischer,* 623 F.Supp. 1064.

**53.** *Rajcooar,* 89 F.Supp.2d 324; *Tandon,* 926 F.Supp. 366; *Walker,* 775 F.Supp. 111.

attack during flight and requested that the aircraft be diverted to another airport. The carrier declined and continued the flight to its scheduled destination. The court held that the circumstances did not constitute an "accident" under Article 17, though it upheld a determination that they gave rise to liability under state law for the carrier's negligence in handling the passenger's medical emergency.

Applying the approach it formulated which directs the relevant inquiry at a purely factual description of the precise external events that allegedly caused the passenger's aggravation injury—as opposed to scrutinizing the actions of the crew—the court concluded that the event in question was the continuation of the flight from its scheduled point of departure to its scheduled arrival and the resultant delay in hospitalization, in which case the aggravation injury did not arise from an unexpected or unusual happening, but rather from the passenger's own internal reaction to the usual, normal and operation of the aircraft.[54]

In *Abramson*, the passenger, suffering from a preexisting paraesophagael hiatal hernia, experienced an attack of his condition during flight. He asked the flight crew for assistance in finding seats where he could lie down to administer self-help through which he could obtain some relief. The flight attendant, responding falsely that there were no vacant seats available, refused to help; plaintiff claimed that the carrier's failure to provide assistance to him worsened his injuries. The Third Circuit found that the aggravation of a passenger's injury was not an unusual or unexpected occurrence and hence not an Article 17 accident, holding that "in the absence of proof of abnormal external factors, aggravation of preexisting injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17."[55]

This Court is mindful of these precedents. Conceivably they could be read to indicate a similar ruling here. Both *Krys* and *Abramson*, however, predate *Tseng*, and while perhaps not explicit or controlling in those cases, the consideration that the plaintiffs' remedy under the Warsaw Convention was not exclusive could have played some role in affecting the outcome, a factor the *McDowell* court surmised might have had some bearing in *Krys*.[56]

In view of the significant uncertainties still prevailing as to the proper application of *Saks* to situations such as those at issue here, and in the absence of any Second Circuit ruling directly on point, this Court does not feel obliged to follow the precedents of the other Circuits under the circumstances presented by the case at bar. The Court notes that while two recent rulings of district courts in this Circuit have found no accident in connection with heart attack incidents involving circumstances that may be considered somewhat analogous to those involved here, those cases are distinguishable in some material respects.[57] Moreover, other courts exam-

**54.** *See Krys,* 119 F.3d at 1521.

**55.** *Abramson,* 739 F.2d at 133.

**56.** *See McDowell,* 54 F.Supp.2d at 1319 (noting that the Eleventh Circuit—when it decided *Krys*—was of the opinion that where a plaintiff did not have a claim under the Convention he could resort to state law, as was the case in every prior case the *McDowell* court found where a heart attack during flight was held not to constitute an accident. The court then remarked that after *Tseng,* "the *Krys* rationale operates to completely deprive the instant Plaintiff and future plaintiffs in similar positions of any cause of action whatsoever.").

**57.** *See Rajcooar,* 89 F.Supp.2d 324 (passenger suffered a heart attack, collapsed and died

ining comparable circumstances have reached different conclusions.[58]

Most recently, two other courts distinguished and declined to follow the *Krys* and *Abramson* reasoning in cases presenting facts analogous to those at issue here. In *Husain,* a court in the Northern District of California, held that a passenger who died from an asthma attack during a flight was the victim of a Warsaw Convention accident caused by failure of the airline to move his seat assignment farther away from the non-smoking section of the plane.[59]

The *Husain* court distinguished and declined to follow *Krys, Abramson* and *Tandon.* It found that the flight attendant's failure to transfer the stricken passenger—in disregard of industry standards and airline policies—precipitated the plain-

tiff's injury and death. Noting that when a flight attendant's acts create a foreseeable risk of injury to passengers an "accident" has occurred, the court found that the airline crew's failure to comply with applicable standards of care were both "unusual" and "unexpected".[60] Furthermore, the court stated that "[w]hen a passenger boards an airplane, he or she should be able to expect that the flight crew will comply with accepted procedures and rules. A failure to do so is unexpected." [61]

Similarly, in *McCaskey v. Continental Airlines, Inc.,*[62] the court accepted plaintiff's theory that an accident could be found to have caused the passenger's post-stroke injuries arising from the airline's conduct in maintaining an inadequate supply on board the aircraft; failure to divert the flight; and the crew's inadequate re-

---

while waiting on line at the gate to board plane; there were allegations that the airline failed to provide timely medical assistance, but the court did not address whether or in what manner the carrier had any involvement in rendering assistance and thus any causal role in the alleged injury); *Tandon,* 926 F.Supp. at 371 (airline's failure to maintain an adequate supply of oxygen on board the aircraft to assist a passenger who had suffered a heart attack was not unusual or unexpected; because the internal condition that triggered the heart connection was not an unusual and unexpected event, the court, citing *Fischer* and *Abramson,* held that the carrier's later failure to provide proper care did not qualify as an accident).

**58.** *See Seguritan v. Northwest Airlines, Inc.,* 86 A.D.2d 658, 446 N.Y.S.2d 397, 398 (N.Y.App. Div.2d Dept.), *aff'd,* 57 N.Y.2d 767, 454 N.Y.S.2d 991, 440 N.E.2d 1339 (1982) (holding that the accident at issue was not the heart attack suffered by the passenger, but "[r]ather, it is the alleged aggravation of decedent's condition by the negligent failure of defendant's employees to render her medical assistance"); *Fishman,* 132 F.3d at 143 (passenger's ear injury resulted not from normal change in cabin pressure but from flight attendant's application of a hot compress).

**59.** *See Husain,* 116 F.Supp.2d at 1121.

**60.** *Id.* at 1135.

**61.** *Id.* at 1134; *see Tsevas,* 1997 WL 767278, at *3 (finding injuries that plaintiff sustained from a physical and sexual attack by a fellow passenger were caused, at least in part, by the airline's serving the assailant too much alcohol and failing—after repeated requests—to change plaintiff's seat, the court declared that these events were unusual, unexpected and external to the passenger: "Neither [the passenger's] attacks nor the flight attendants' actions, or lack thereof, are indicative of 'normal and expected operation of the aircraft.' "). *But cf. Brandt v. American Airlines,* No. 98 Civ.2089, 2000 WL 288393, at *7 (N.D.Cal. Mar.13, 2000) (accident found where plaintiff claimed the carrier failed to provide him with food which he requested to take a medication required to be consumed with food, thereby allegedly aggravating his medical condition; the court noted the flight was a beverage-only flight and that it was not unusual for such flights not to serve meals, despite plaintiff's contention that there was food for the flight crew).

**62.** 159 F.Supp.2d at 572–72 (S.D.Tex. Aug.17, 2001).

sponse to the emergency. Like the court in *Husain,* the *McCaskey* court found the *Krys* and *Abramson* analysis unpersuasive. Among its reasons the court noted, like the *McDowell* court, that both cases predated the Supreme Court's ruling in *Tseng.*[63]

Thus, there is no unanimity or even clear consensus among the courts which have considered the issue whether in-flight aggravation injuries related to a passenger's preexisting medical condition—at least where the relevant harm or loss may be connected in some way to operation of the aircraft or airline or conduct of carrier personnel—may qualify as a Warsaw Convention "accident." Moreover, *Tandon* and other contrary precedents also predate *Fishman*[64] and *Wallace,*[65] which articulate the Second Circuit's most recent pronouncements and applications of *Saks*'s interpretation of Article 17. The reasoning and guidance of these cases cast doubt on the viability of the theories and precedents on which Malev relies and have significant bearing in resolving the dispute at hand.

In fact, the outcome Malev urges can not be squared with the Second Circuit's instruction in *Fishman.*[66] There the Court, distinguishing *Abramson, Tandon, Wallace* and *Fischer,* held that the relevant injury arose from a flight attendant's application of a scalding compress on the

ear of a child who suffered from a preexisting ear problem that had been aggravated by the changing cabin pressure during flight. The court stressed that only that event—not the normal descent of the plane and attendant normal pressure differences—constituted the cause of the passenger's accident.[67]

In so ruling, the court implicitly affirmed the causal role of operation of the aircraft and of flight crew or operational procedures as relevant aspects of the "unusual or unexpected event" inquiry. The court elaborated:

> By the same token, a claim *does* allege an "accident" if it arises from some inappropriate or unintended happenstance in the operation of the aircraft or airline. Thus, an injury resulting from routine procedures in the operation of an aircraft or airline can be an "accident" if those procedures or operations are *carried out* in an unreasonable manner.[68]

Like the circumstances present in the case at hand, the accident in *Fishman* was not an internal reaction to the normal operation of the aircraft and its effect on the passenger's illness. Rather, the unusual and unexpected occurrence that caused the injury was the flight crew's departure from what objectively could be expected conduct on the part of the airline and its personnel.[69] Here, as in *Fishman,* an as-

---

**63.** *See id.* at 573–74.

**64.** 132 F.3d 138.

**65.** 214 F.3d 293.

**66.** 132 F.3d 138.

**67.** *See id.* at 145 ("[T]he injury here is not the earache, but the application of scalding water to treat it. The earache was caused by the change in air pressure, which is part of the normal operation of the plane as it descends, and was not an accident.").

**68.** *Id.* at 143 (emphasis in original).

**69.** *See id.* at 143; *see also Tseng,* 525 U.S. at 166 n. 9, 119 S.Ct. 662, where the Supreme Court commented on the Second Circuit's finding that an intrusive search of a passenger conducted by airline personnel as part of a terrorism prevention effort was a routine operating procedure incident to international air travel and thus not an unusual or unexpected event. The district court, "using the flexible application prescribed by the Supreme Court" had concluded that the plaintiff's search was an accident, ruling that a routine

sessment of all the circumstances can support a finding that the inappropriate happenstance "in the operation of the aircraft or airline"[70] arose from actions or omissions by a flight crew in carrying out aircraft or airline procedures or operations in an unreasonable manner during its response to the emergency medical needs of a stricken passenger and that such failure represented an unusual and unexpected happening.

In *Wallace*, the Second Circuit ruled that a sexual assault committed by a male passenger against the female plaintiff sleeping in an adjoining seat in a darkened plane was sufficiently unexpected and unusual to satisfy the *Saks* definition of an accident. Under the court's factual recitation, there was no indication that the airline's flight crew had prior awareness of or direct involvement in the incident, and the crew changed the plaintiff's seat as soon as she complained. Nonetheless, the court did cite circumstances that implicate a causal role of the flight crew in the events, even if attenuated and indirect rather than affirmative.

When the incident occurred, the court noted, the aircraft's lights were turned down and the sexual predator "was left unsupervised in the dark."[71] Remarking on the time that must have elapsed for the attacker to complete his entire delicate procedures undetected, the court stated that it "could not have been entirely inconspicuous" and that during the entire duration of the assault "not a single flight attendant noticed a problem."[72]

Also significant, the *Wallace* majority not only declined to rule out, as the concurring opinion suggested,[73] but relied upon the qualifying standard of risks "characteristics of air travel" that the district court had applied in finding no actionable accident under Article 17.[74] Accordingly, this Court must accept that the doctrine still has vitality in this Circuit as an indicator of what comprises unusual or unexpected events and of what may qualify as the normal operation of an aircraft or airline for the purposes of evaluating the occurrence. *Wallace* thus instructs a flexible application and finding of an "accident" even under circumstances where the carrier's operations or procedures or personnel's causal involvement in bringing about the injury, even if attenuated, nonetheless may be a consideration in causing an Article 17 accident.

This Court cannot reconcile the incongruities inherent in ruling that a deliberate sexual assault by a passenger against another—or indeed even a terrorist attack on a plane[75]—with no knowledge or direct complicity by airline personnel, or with only their minimal involvement, objectively would qualify as an accident supporting Warsaw Convention liability, but that a different result should obtain in a case where the alleged injury is produced by the material complicity of the carrier's flight crew as principal actors in precip-

---

search applied erroneously could be fairly characterized as an accident. *Id.* The Supreme Court, while accepting that the issue was not in contention because the parties had not raised it before the Court, nonetheless took an unusual step in remarking that "[i]t is questionable whether the Court of Appeals 'flexibly applied' the definition of 'accident' we set forth in *Saks." Id.* at 164, 119 S.Ct. 662.

70. *Id.*

71. *Wallace,* 214 F.3d at 299.

72. *Id.*

73. *See id.* at 300 (Pooler, J., concurring).

74. *Id.*

75. *See Evangelinos,* 550 F.2d 152; *Day,* 528 F.2d 31.

itating the events causing the injury in question, through their alleged failure, in violation of the carrier's own policies and operational procedures, to render adequate medical assistance to a passenger stricken by a heart attack.

The courts in *Krys*[76] and *Abramson*[77] stressed that, absent proof of "abnormal external factors", aggravation of a preexisting injury during the course of a "routine and normal flight" should not be considered an accident within the meaning of Article 17. What is unusual or unexpected should be gauged by what objectively is usual or reasonably to be expected under particular circumstances. By almost any measure, a flight during which a traveler suffers a heart attack or other life-threatening emergency calling for immediate medical assistance and extraordinary choices by the flight crew regarding the operation of the aircraft can hardly be termed "routine" or "normal", insofar as the stricken passenger notifies the flight crew and requests appropriate relief.

Those circumstances typically demand the exercise of the most calibrated judgments, many of which could affect or even disrupt normal operation of the aircraft or airline. In such situations, as in the instance case, the pilot may be called to weigh a host of essential and demanding variables, including the condition and risk to the ailing passenger; the safety and interests of the rest of the passengers and crew; and the impact of any decision on the carrier's finances, industry standing, regulatory exposure and public reputation. The flight crew's attention may thus be distracted from methods of aircraft operation customary to anticipated, routine flight. A pilot's decision whether to divert a flight—fraught as the choice may be with

grave implications under almost any circumstances, and calling not only for the exercise of exacting judgment but perhaps the application of a different set of carrier policies and procedures and industry standards—cannot be termed part of a "normal", usual or expected mode of operation of a flight.

The flights in *Saks* and the comparable cases cited[78] may be characterized as normal and uneventful in one respect. In all of those cases, the aircraft continued from the point of departure to disembarkation without any call upon the pilot or crew to exercise judgment or to apply any procedure or element of operational control within the carrier's unique domain. In other words, the flight entailed nothing more than the ordinary functioning of aircraft and crew that was anticipated to guide the plane uneventfully from its port of origin to its scheduled destination.

By contrast, in this case, the crew is alleged to have been called upon to exercise precisely such additional and divergent judgments and to have made the choice to continue the Flight to its appointed destination, presumably aware of the stricken passenger's condition. In other words, the carrier made a deliberate choice to operate the flight one way rather than another, to pursue a course under one procedure instead of another. One course, the one chosen, was "normal" and uneventful insofar as it led the flight directly to its intended destination.

But the Flight was not "normal" in that, by not diverting, it led to Fulop's more serious injuries. One way could have brought Fulop relief sooner, and possibly averted his attendant worsened injuries; the other, otherwise routine, delayed ade-

---

**76.** 119 F.3d at 1520.

**77.** 739 F.2d at 133.

**78.** *See* cases cited *supra,* nn. 19, 48.

quate medical treatment and produced Fulop's aggravated condition at issue here. One way, the route not chosen, would have complied with airline and industry practices, while the "normal" scheduled flight in fact allegedly contravened established rules.

Whether in the final analysis the flight crew's acts under these circumstances were culpably negligent is beside the point. What does matter, in this Court's view, is that the Flight and the air carrier's operation were not routine or normal in the sense that they allegedly deviated from compliance with expected procedures and that the departure and its associated delay in bringing emergency relief sooner may have aggravated Fulop's injury. To this extent, Fulop's injury may be causally traced to the carrier's fateful choice, and represented an "external" factor that brought about at least the particular aggravation injury here in contention. Here, it is worth repeating *Saks*'s flexible mandate: "Any injury is the product of a chain of causes, and we require only that the passenger be able to prove that *some* link in the claim was an unusual or unexpected event external to the passenger." [79]

This discussion suggests that what is unusual or unexpected may be measured different ways. Quantitatively, the assessment may be judged by the statistical probability of a particular happening. But the standard way also reflects value-laden dimensions. Viewed by the figurative and foreseeable likelihood of the event, under the purely factual inquiry the *Krys* doctrine would demand, it was not unusual or unexpected that Fulop, given his preexisting condition, could suffer a heart attack during the Flight, nor was it unusual or unexpected, or even debatable, that if he encountered substantial delay in obtaining adequate medical assistance, his illness would substantially worsen. Gauged strictly from a stark analysis of the events—putting aside the contributing role of the flight crew—what happened to Fulop then was the natural consequence of his internal reaction to not receiving medical treatment for a heart attack—a statistically foreseeable end, and to that degree not rare, unusual or unexpected.

This bland approach, however, may be deficient. Its principal flaw rests in that it gives short shrift to causation and consequently casts a cold eye on suffered harms. The analysis overlooks the intervention of an independent superseding cause of the precise injury in contention: the delayed arrival of medical attention reasonably attributable to a knowing choice of the flight crew related to the operation of the aircraft or the airline. That fateful act or omission, under *Saks*, would count as a link in the causal chain—in fact, a vital connection very proximately related to the asserted injury.

Turning to the qualitative aspects, something unusual or unexpected may be so regarded because it manifests a departure from a recognized norm that reflects an acceptable mode of conduct. As exemplified by the concept of cruel or unusual punishment, our law is not founded purely on figurative probabilities. It embodies safeguards to protect and preserve our most cherished values, among which are respect for the rule of law and the intrinsic worth and sanctity of human life. An occurrence that, by disregarding rules adopted to promote these ends causes injury, deviates from our core values. Whatever its statistical likelihood or prevalence, the departure should be deemed unusual or unexpected in a much more profound sense of the words.

---

79. *Saks*, 470 U.S. at 406, 105 S.Ct. 1338 (emphasis added).

Because the services provided by airlines and their responses to emergencies occurring during flight are closely related to aircraft and carrier operations, their failure to perform to reasonable standards of care could have a causal role in bringing about passenger injury. If such aberrant conduct contravenes the airline's established customs, rules or procedures, in this Court's view, the violation could be deemed an abnormal operation of the aircraft or the carrier, and ruled to be unusual and unexpected.[80]

Objectively, a passenger aboard an airplane is entitled to harbor the expectation that should serious medical emergencies arise, the flight crew would comply with established rules and procedures and otherwise exercise the utmost standard of care appropriate to the urgency in handling the situation, and that the risk of the carrier's failure to do so would not be passed on to the traveler.[81] Here, it was unusual or unexpected that, after Fulop suffered a heart attack during normal flight and apprised Malev of his life-threatening condition, the carrier, having options consistent with its operations and procedures, would have chosen to continue the Flight to its destination unconcerned with the medical consequences to Fulop.

An opposite result would engender other anomalies inconsistent with the overall scheme intended by the Warsaw Convention. By total inaction, or indeed through substandard response to a passenger's medical condition that aggravates an injury, the air carrier could escape all liability and duty of care to a passenger encountering an emergency medical need, so long as the original injury resulted from a reaction to normal aircraft operation internal to the passenger.[82] The effect of such an approach would be to readjust substantially the balance of interests and the allocation of risks of air travel as between passengers and carriers. Passengers encountering medical emergencies would be required to assume the risk of failure by the airlines to observe their own standards and procedures and to carry out routine operations that are intended to protect the lives and safety of passengers, and also entirely and uniquely within the carrier's knowledge and ability to manage or control.

In a post-*Tseng* regime of exclusive jurisdiction for certain aviation harms, this course, under some circumstances, would convert a Warsaw Convention scheme of virtual strict liability to no liability at all for the carriers. As the *McDowell* court remarked: "While a primary purpose of the Warsaw Convention may have been to limit the liability of air carriers ... complete absolution of liability surely was not a purpose."[83] The airlines thus would be held liable for intentional assaults by passengers on other passengers that the carriers may have little ability to avert or control and which may have little or only remote or theoretical connection to the operation of the aircraft. At the same time, the airlines would be absolved of liability in instances entailing harmful acts or omissions by their own personnel, even where the carrier's agents have direct

---

80. *See Husain,* 116 F.Supp.2d at 1133.

81. *See id.*

82. *See McDowell,* 54 F.Supp.2d at 1320 (noting that the effect of *Krys* and *Tseng* "is a dissolution of an airline's duty of care to its passengers so long as the cause of a passenger's initial injury is internal to the passenger

himself. This holds true so long as the airline takes no affirmative action which aggravates the injury. Complete inaction is acceptable, even if in doing nothing the airline aggravates the passenger's injury.").

83. *See id.* at 1319.

causal role and complicity in the injury in a manner implicating operations of the airline or aircraft.

This Court concludes that a finding that the circumstances Fulop alleges constitute an accident within the meaning of Article 17 accords with the flexible application of the term that the Supreme Court's definition in *Saks* compels and with the apportionment of the balance of interests and risks of air travel under the Warsaw Convention. For the foregoing reasons, the summary judgment motion is denied.

## V. *WILLFUL MISCONDUCT*

Fulop claims that Malev's misconduct was willful "in that it either (a) knew that its failure and/or refusal to divert the Flight for Mr. Fulop's medical emergency would probably result in injury, or (b) acted in a manner that implied a reckless disregard of such probable consequences." Compl., ¶ 25.

Malev has moved for judgment on this claim, arguing that proof of willful misconduct under Article 25 of the Convention removes a limitation of liability under Article 17 and does not create a separate cause of action. *See* Memorandum of Law in Support of Motion, dated Mar. 6, 2001, at 12. Plaintiffs have failed to address this argument in their opposition. The Court agrees with Malev, and its motion is granted in connection with this claim. *See In re Hijacking of Pan American World Airways, Inc.*, 920 F.Supp. 408, 413 (S.D.N.Y. 1996).

### CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment is granted in connection with the willful misconduct claim; and it is further

**ORDERED** that defendant's motion for summary judgment is denied in connection with the "accident" claim under Article 17 of the Warsaw Convention; and it is further

**ORDERED** that this Decision and Order amend the Court's oral decision on August 23, 2001; and it is further

**ORDERED** that the parties shall confer and submit a proposed Case Management Plan to the Court so as to be received no later than Friday, November 9, 2001.

**SO ORDERED.**